MAX N. TOBIAS, JR., Judge.
 

 hOn 7 November 2002, the state indicted co-defendants/brothers, Thatcher McEl-veen (“Thatcher”) and Terry McElveen (“Terry”), with one count each of first-degree murder, a violation of La. R.S. 14:3o.
 
 [1]
 
 Both Thatcher and Terry pled not guilty at their respective arraignments. On 26 March 2004, both defendants moved to suppress physical evidence and audio-taped statements and sought severance of their eases.
 

 On 8 March 2005, the trial court heard testimony on defense motions to suppress evidence and identification. The trial court heard additional testimony on those motions on 9 May 2005. On 13 May 2005, the trial court denied all motions to suppress
 
 [2]
 
 and granted the defendants a severance of trials.
 
 [3]
 
 Subsequent motions to suppress evidence were denied on 27 September 2006. The trial court denied the motions to suppress identification on 23 October 2008. On 30 January 2009, each of the defendants waived his outstanding motion to suppress.
 

 |«>On 2 March 2009, the state amended the indictment to charge both defendants with second-degree murder, a violation of
 
 *1043
 
 La. R.S. 14:30.1. The defendants elected trial by jury. Trial testimony was heard 4-12 March 2009. On 13 March 2009, the jury found both defendants guilty as charged. On 5 May 2009, the defendants filed Motions for New Trial and Arrest of Judgment. Two days later, on 7 May 2009, they moved for post-verdict judgments of acquittal. On 8 May 2009, the trial court denied the defense motions and sentenced both defendants to life imprisonment without benefit of probation, parole, or suspension of sentence. Immediately following sentencing, the defendants filed Motions for Appeal.
 

 On appeal, Terry raises fifty-seven issues in thirteen multi-part assignments of error, of which eight assignments are the same as those raised by co-defendant Thatcher. Terry’s issues are grouped by subjects into eight errors as to sufficiency/admissibility/suppression of the evidence; fourteen
 
 Batson
 
 issues; two mistrial arguments; five issues pertaining to cross examination; five arguments as to an alleged confession; one error with regard to the victim impact statement; two objections to the verdict form; three complaints concerning jury instructions; two claims of excessive sentence; one complaint of non-unanimous jury verdict; three breaches of the right to appeal, and one assignment vis-a-vis cumulative errors. Generally, the defendants argue thirteen overall claims as to the admissibility, sufficiency, and suppression of evidence;
 
 Batson v. Kentucky,
 
 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) challenges; violation of the confrontation clause; impeachment of witnesses; limited/curtailed cross examination; severance of trials; mistrial; verdict form; jury instructions; jury verdict; excessive sentence; and right to appeal.
 

 \ .FACTS
 

 On 9 September 2002, twenty-one year old Tulane University student, Jonathan Lorino (“Mr. Lorino”), was stabbed to death in his Fourth Street apartment in New Orleans. The next day, Ms. Janice McElveen informed the police that her sons, Thatcher and Terry, had committed the murder.
 

 In September 2002, Emily Smith (“Ms. Smith”), Mr. Lorino, and another student shared an apartment at 1011 Fourth Street in New Orleans. Around noon on 9 September 2002, Ms. Smith was in her upstairs apartment bedroom preparing to leave for class when the doorbell rang. Mr. Lorino was in his bedroom downstairs studying and did not answer the door. On previous occasions, the roommates experienced young boys coming to the apartment asking for money, which Mr. Lorino sometimes gave them. Ms. Smith assumed Mr. Lorino did not answer the door for that reason. When the doorbell rang a second time, Ms. Smith heard Mr. Lorino walk to the door and open it. She then heard him say, “Actually, no, I don’t.” She heard a scuffle and the door slam. Then she heard Mr. Lorino say, “Oh, my God!” After that, there was silence. Ms. Smith crept to the staircase and peeked down to the front of the apartment. Though she could not see their faces, she observed two intruders — tall, thin, young, black-complexioned males. One of the intruders held Mr. Lorino from behind in a choke hold while the other held Mr. Lorino’s feet. The intruder holding Mr. Lorino from behind had on a dark T-shirt, and the one holding his feet wore a white T-shirt. Ms. Smith heard a lot of shouting and heard Mr. Lorino say, “Take my money, take whatever you want, just, please, don’t hurt me.” With that Ms. Smith thought it was a robbery, |4and that it would be over shortly. ' When she heard footsteps in the apartment, she feared the intruders would find her, so she ran into the bathroom, called 911, and reported the incident, after
 
 *1044
 
 which she ran into her bedroom and armed herself with scissors for protection. At some point, she heard the downstairs door slam, but she was too frightened to investigate. The phone rang, but she was too scared to answer it. The doorbell rang again, and she opened it, but no one was there. She answered the phone, and the police told her to open the door. As she went to the door again, she saw a large pool of blood right by the door, and she started screaming. Ms. Smith saw Mr. Lorino lying on the floor with his eyes open and stab wounds on the side of his body. She panicked and tried to exit the apartment, but Mr. Lorino’s foot was blocking the door. She exited the apartment when New Orleans Police Department (“NOPD”) officers pushed the door open. She collapsed on the porch screaming. The officers took Ms. Smith to the Sixth District police station where she gave a statement. At the station, Ms. Smith’s landlord informed her that Mr. Lorino had died.
 

 Ms. Janice McElveen (“Ms. McElveen”) testified that on 9 September 2002 she shared an upstairs apartment at 724 Fourth Street with her boyfriend, Andre Thomas, and her son, Thatcher. However, on that morning as Ms. McElveen was downstairs in her sister-in-law’s, Easter Thomas’, apartment. Thatcher asked her for a cigarette. When she told him she did not have any, Thatcher told her that he and Terry were going to get some even “if [they] have to kill somebody.” "When Thatcher and Terry left, Thatcher was wearing a blue shirt and Terry had on a white shirt.
 
 [4]
 
 They returned to their mother’s apartment about 1:00 p.m., sweaty, |snervous, and carrying a pillow case containing a CD player. Ms. McElveen noted that Thatcher had no shirt on, and that Terry was carrying his shirt. She observed blood on Thatcher’s pants. Terry had a cut on his leg that he said Thatcher had given him. Thatcher had a cut on his arm.
 

 Earlier in the day, Ms. McElveen learned that Mr. Lorino had been murdered by two black males. She suspected her sons and asked them if they were involved in the crime; Thatcher and Terry told her no. The defendants went upstairs to bathe and dressed to leave again. When she asked about the CD player and accused the defendants of murdering the victim, Thatcher told her if she called the police, he would kill her when he got out of jail. Thatcher and Terry then left the house. Ms. McElveen called the police and turned her sons in for the victim’s murder. The police transported her to the Sixth District station where she was questioned and gave a taped statement. She admitted to being a heavy drinker in September 2002 and stopped only when she ran out of money to purchase more alcohol. She quit drinking in 2005. She gave her trial testimony from her memory of events as they happened.
 

 Under cross examination, Ms. McElveen said she called the police during the daylight hours of 9 September 2002, despite the police report listing her call as coming in at 12:15 a.m. the following day. She told the police that Thatcher and Terry asked her to take them to a pawn shop so they could buy cigarettes, but later admitted that that was not true. She witnessed the defendants sell the CD player to her sister-in-law, Ms. Thomas. Ms. McElveen heard about the murder and the description of the suspects from the news between the time the defendants left the
 
 *1045
 
 house and their return with the CD player. She acknowledged that she suffered from auditory hallucinations, saw dead people on occasion, was suicidal, and took | fimedications, but that she was not taking medication in 2002. She explained that her memory of the events returned clearly to her in 2005 because she had stopped drinking and that some of what she remembered was contrary to what she told the police. She received $18,000.00 from Crimestoppers for turning in her sons which she gave away. Even though she received the money, she said that was not why she turned them in. She explained she went to the police before she contacted Crimestoppers and told the police what she observed because “[the defendants] took somebody else’s child’s life and that caused [her] pain.”
 

 On second re-direct, Ms. McElveen explained that defense attorneys had visited her twice to discuss the facts of the case and had suggested to her that a set of keys had been taken from the victim’s house. She also said that defense attorneys told her that she would not have to testify at trial if her sons accepted a plea bargain,
 
 [5]
 
 and that one of the attorneys secured for her a lawyer because she was told by them that she might need one.
 

 On second re-cross examination, Ms. McElveen testified that defense attorneys never told her to lie. She testified that the signature at the end of a written statement given to a defense investigator was not hers.
 

 Officers James Alexander and Larry Coleman responded to a call concerning an attack upon a person at 1011 Fourth Street at around 1:00 p.m. on 9 September 2002. At the scene, they met Sergeant Avery Matthews (“Sergeant Matthews”), who was knocking at the front door. A hysterical woman opened the front door, and officers observed the bleeding victim on the floor. When the woman exited the house, she began telling them what had happened. As Sergeant 17Matthews talked to the woman, Officers Alexander and Coleman secured the scene and canvassed the area for the perpetrators and witnesses.
 

 On 9 September 2002, at 12:54 p.m., senior police dispatcher, Stephanie Bris-coe, received a 911 call from Ms. Smith reporting that two assailants were attacking her roommate at their residence on Fourth Street.
 
 [6]
 
 Officers arrived on the scene at 1:00 p.m., and by 1:09 p.m. the police had radioed a description of the perpetrators as two black males, one wearing a blue shirt and the second wearing a white shirt.
 

 When EMT paramedic Francene Jones arrived at the scene on Fourth Street at 1:11 p.m., she found the victim lying on his back in the front doorway of the residence. First responders from the New Orleans Fire Department had already begun basic life support; however, upon administering shock treatment, Ms. Jones noted that the victim went into flat line — exhibiting no vital signs. Ms. Jones continued checking the victim’s vitals every five minutes until 1:36 p.m. when the paramedics transported the victim’s body to the Medical Center of Louisiana.
 

 NOPD crime scene technician, Teddy Frambo, and NOPD Officer Thomas Kennedy, were dispatched to 1011 Fourth Street. Officer Kennedy photographed
 
 *1046
 
 the area while Mr. Frambo diagramed and measured the first and second floors of the residence, the position of the victim’s body, a man’s wallet, a shirt with blood on it, and a bloody kitchen knife found wrapped in a towel on a chair in the front room of the house. In addition to photographing the inside of the residence, Officer Kennedy also photographed adjacent houses and the backyard fence of the Fourth Street address showing a white sock snagged on the fence.
 

 | ¡¡At the time of the murder, Mauricio Hernandez (“Mr. Hernandez”) was looking out the window of his office at 1008 Third Street, when he saw two men run past. He opened the door to see the men jump over an iron fence and run toward the Mississippi River. He described the runners to the police as young black males, one wearing a white shirt and the other a blue shirt.
 

 Forensic pathologist, Dr. James Traylor, autopsied the victim’s body, and rendered a report which indicated that the victim stood five feet, two inches tall and weighed 125 pounds. The report further indicated that the victim suffered three stab wounds inflicted by a single edged knife blade. The wound to the right side of the victim’s neck cut the jugular vein. Of the two wounds to the victim’s upper left chest region, one hit the pericardial sack, incising the heart, and the other cut the lung and diaphragm. Dr. Traylor identified photographs of the victim’s wounds and opined that the victim bled to death in a matter of minutes.
 

 Under cross examination, Dr. Traylor indicated that the victim’s wounds would not have caused arterial spray or blood cast off because the wounds caused internal bleeding.
 

 Now-retired NOPD Officer Peter Cua-drado (“Officer Cuadrado”) responded to the stabbing scene in the early morning hours of 10 September 2002. His crime scene report indicated that he met with lead Detective Robert Hoobler (“Detective Hoobler”) and photographed the exterior and interior of the house. Officer Cuadra-do’s photographs included pictures of a plastic bag of clothing placed on the kitchen table, a white towel on the downstairs bathroom sink, two check book covers in a plastic bag on a table in the side yard, and various shots of the upstairs bedroom. Another picture taken by the officer was of a shirt with an American flag logo resting on an ice chest located near the downstairs bathroom.
 

 IcAfter midnight, on 10 September 2002, NOPD Detective Hoobler of the homicide division received a telephone call from Ms. McElveen. In response to the call and the information given by Ms. McElveen, he contacted Detective Matthews, and the two men relocated to Ms. McElveen’s residence. They transported her to the police station where she gave a taped statement and identified photographs of the defendants. After giving her statement, Ms. McElveen signed a form consenting to a search her 742 Fourth Street residence. Pursuant to that search, Detective Hoobler contacted Officer Cuadrado to photograph and collect evidence — a white T-shirt, a blue pull-over shirt, towels, one sock, and a pillow case. Detective Hoobler’s search of a trash can outside of the house produced a blue shirt with a flag on it. After leaving Ms. McElveen’s residence, Detective Hoobler relocated to the crime scene to re-canvas that area. He called the crime lab to take additional photos and chemical tests. After that he returned to the station and turned in his notes, which concluded his participation in this investigation.
 

 Detective Hoobler admitted that he had been disciplined once for violating NOPD regulations during the execution of a
 
 *1047
 
 search warrant relating to a homicide investigation. He explained that at that time he was working for the FBI’s gang task force and had stored drug paraphernalia seized during the execution of the warrant in his secure personal storage locker at the FBI field office. In filling out the incident report for submission to the district attorney’s office, he realized that he had left the paraphernalia evidence out of the report so he completed an NOPD evidence card and took all of the evidence, including the paraphernalia, to Central Evidence and Property and logged it in. He noted on the card that the paraphernalia was located at the FBI field office instead of the place where it was | inseized because he mistakenly believed that “location” referred to the place where the evidence had last been located before it was logged into Central Evidence and Property. As a result, Detective Hoobler was suspended for three days for filing a false and inaccurate report in relation to the evidence card.
 
 [7]
 

 Under cross examination, Detective Hoobler verified that he received Ms. McElveen’s call at approximately 1:00 a.m. on 10 September 2002. He confirmed that Ms. McElveen signed a consent-to-search form for her residence at 742 Fourth Street, and that he would not have allowed her to do so, or to make a statement, if he had believed she was intoxicated at the time. He said he did not detect any signs of intoxication from her when she signed the consent form or when she made her statement regarding the events of 9 September 2002.
 

 Detective Hoobler said that when he investigated the scene at 742 Fourth Street, he made mental notes and later reduced them to writing. When he later relocated to 1011 Fourth Street, two NOPD crime technicians were with him. He noticed a spot on top of an entertainment center, which was where he presumed a CD or DVD player may have been taken because of the dust imprint left by the device and the dangling utility wires used to connect the device to the television. He made notes regarding that finding and gave them to Sergeant Matthews for inclusion in Sergeant Matthews’ incident report. Detective Hoobler also noticed scuff marks and a stain on the rear fence at 1101 Fourth Street and directed a crime scene technician to photograph the fence and submit the stain for chemical analysis. Chemical testing proved the scuff to be blood.
 

 | nOn re-direct examination, Detective Hoobler identified a white shirt collected from 742 Fourth Street, as well as a pair of blood stained blue jeans collected from an upstairs area of the dwelling.
 

 Sergeant Matthews testified that on 9 September 2002, at about 1:00 p.m., police received a call from Ms. Smith that two black males were beating the victim in their Fourth Street apartment. When he arrived on the scene accompanied by NOPD Officers Alexander and Coleman, he did not notice any disturbance and could not open the front door. He requested that dispatch call Ms. Smith to let her know that the police were at the front door and to open it. As she descended the stairs, Ms. Smith became hysterical and started to scream as she pointed down at the front door. Through a window, Sergeant Matthews saw the victim’s body lying in a pool of blood, blocking the front door. After they forced the door open and got Ms. Smith out, she gave the officers a description of the assailants. Officers Alexander and Coleman canvassed the neighborhood for the perpetrators and witnesses. Police transported Ms. Smith to
 
 *1048
 
 the Sixth District Station to remove her from the scene and obtain a statement. After she left the scene, Sergeant Matthews and other officers checked the house for any additional victims and made sure the assailants were not still on the premises. He identified crime scene photographs, including those taken of the exteri- or of the apartment as well as pictures of the side and back yards. Some of the photos depicted an open kitchen drawer containing knives; a knife, believed to be the murder weapon, wrapped in a rag and towel on an ottoman or sofa chair in the front of the house; and a white sock on the barbed wire of the back fence. Sergeant Matthews’ investigation of the scene led him to conclude that the assailants left by the side door and escaped through the back yard to Third Street.
 

 |1gAfter completing his investigation at the murder scene, Sergeant Matthews returned to the Sixth District police station and obtained a handwritten statement from Ms. Smith, who also gave the officers a description of the assailants. Later that day, he returned to the scene to re-canvass the area. At that time, he spoke with Mr. Hernandez, who had an office at 1008 Third Street. After speaking with him, Sergeant Matthews contacted Detective Hoobler, and the pair travelled to 742 Fourth Street to convey Ms. McElveen to the police station where she gave a taped statement. Pursuant to Ms. McElveen’s statement, Sergeant Matthews prepared arrest warrants for the defendants. He attended the victim’s autopsy and learned that the victim died from three stab wounds. The following day, Sergeant Matthews learned of the defendants’ arrest and obtained buccal swabs from them. He observed that Terry had a gash on the back of his leg and Thatcher had a cut above his elbow.
 

 Under cross examination, Sergeant Matthews admitted that he could tell that Ms. McElveen had been drinking prior to giving her statement, but he emphatically denied that she was drunk or impaired at the time she gave the statement.
 

 Retired NOPD Criminalist Joseph Tafa-ro (“Mr. Tafaro”) was qualified as an expert in the field of serology. He testified that he was a serologist in the Crime Lab in September 2002 and received requests to perform serological testing on several pieces of evidence relating to the Mr. Lori-no murder. Testing occurred between 11 and 30 September 2002. Mr. Tafaro produced a report in connection with his work on the case that was identified for the jury.
 

 Mr. Tafaro received and inspected several articles of clothing identified as having been worn by the defendants and linked to this case by a series of bar codes. He performed chemical tests on cutouts of each, which indicated the ^presence of blood on a number of the clothing articles, including the blue and white T-shirts; a white, red, and blue T-shirt; a pair of blue jeans; and a bath towel, all of which were seized from the McElveen residence. Mr. Tafaro packaged the cutouts from several pieces of clothing and logged them into Central Evidence and Property. He also received a card from the coroner containing Mr. Lorino’s blood, as well as hair samples from the victim. He did not perform any tests on those items and instead signed and dated the envelopes they came in and returned them to Central Evidence and Property on 10 September 2002 so that DNA lab personnel could collect them, along with the clothing cutouts for further testing.
 

 On cross examination, Mr. Tafaro testified that on 10 September 2002 he also received a pair of white tennis shoes and a pair of black shoes separate from the other clothing items, and examined them for
 
 *1049
 
 blood with negative results. He stated that he maintained the same description of items he received and returned to Central Evidence and Property as were given by their previous handlers in order to maintain a consistent description of each item. Mr. Tafaro explained that the description of the white T-shirt with the' red Ralph Lauren logo on it found in the McElveen residence as a “white T-shirt” was sufficient to identify that piece of clothing, despite the fact that the logo was not mentioned on the evidence receipt or card. Further, he explained that an assigned Central Evidence and Property barcode was used to maintain a consistent identification of the shirt as well. Mr. Tafaro stated that evidence is not removed from the serology lab by personnel.
 

 On re-direct examination, Mr. Tafaro confirmed that the white T-shirt and blue jeans submitted for testing were believed to belong to Thatcher. On re-cross examination, Mr. Tafaro explained that he could tell the difference between the 114two white T-shirts collected as evidence in the case by their unique barcode numbers and separate packaging.
 

 Dr. Anne H. Montgomery (“Dr. Montgomery”) testified and was stipulated to be an expert in forensic DNA analysis. Dr. Montgomery told the court that she was the DNA technical leader of the NOPD’s Crime Lab from 2001 to 2007, and that the DNA lab was in the process of obtaining its national certification — which it received in June 2003 — at the time of Mr. Lorino’s murder. Dr. Montgomery explained that the audit process to obtain national certification requires that a lab be up and running and has files to audit.
 

 Dr. Montgomery told the court that the case file relating to this murder survived Hurricane Katrina in its entirety, including the lab report prepared in connection with testing performed in this case. She identified the 5 November 2002 report issued by the DNA lab relating to this case, which contained the testing results for the knife used to murder Mr. Lorino, fingernail scrapings from both defendants, Mr. Lori-no’s blood card, buccal swabs taken from the defendants, and clothing cutouts submitted by Mr. Tafaro. Dr. Montgomery explained that the testing samples were assigned DNA numbers that corresponded to the specific Central Evidence, and Property barcode identifying each piece of evidence. She also identified the internal DNA lab documents memorializing the chain of custody of each tested item throughout its time in the lab. Each item was photographed prior to analysis.
 

 Testing on the handle of the knife used to stab Mr. Lorino resulted in a positive match with him and excluded both defendants as genetic donors. Dr. Montgomery explained that since a knife may be handled by many people, the presence or absence of a particular person’s DNA on its handle is not surprising. | 15She also said that a person would not likely leave genetic residue on the knife if it was wrapped in something before handling. Testing on the fingernail scrapings taken from the defendants did not reveal any foreign DNA; however, Dr. Montgomery explained that foreign genetic material may be removed by cleaning the area to be examined.
 

 Testing confirmed that the blood on the blue jeans was consistent with Terry’s genetic profile and excluded both the victim and Thatcher as contributors. The blood on the blue T-shirt found at 742 Fourth Street was consistent with Thatcher’s. The blood on the white, red, and blue T-shirt and one of the face cloths found at the McElveen residence was consistent with Terry’s. Finally, the blood on the white T-shirt found in the McElveen residence was consistent with the blood sam-
 
 *1050
 
 pie card from Mr. Lorino. The testing concluded that the chances of the blood on the white T-shirt belonging to anyone other than Mr. Lorino were one in greater than ten billion.
 

 Major Bruce Little (“Major Little”) participated in the arrest of the defendants at their brother’s, Elton McElveen’s, residence at 1731 Third Street. After
 
 Miran-dizing
 
 the defendants, Major Little relocated them and Elton McElveen to the Sixth District police station. The defendants and Elton McElveen asked to confer with one another while in custody, which Major Little allowed. Major Little noted that the Thatcher and Terry appeared nervous and looked around the room as if looking for recording devices. They lowered their voices and began discussing who would take the homicide charge.
 

 Forensic Consultant Rex Sparks (“Mr. Sparks”) was qualified as a defense expert in crime scene reconstruction and blood stain pattern analysis and testified that he was employed as an Identification Technician with the Des Moines, Iowa | ^Police Department. Although Mr. Sparks did not personally view the crime scene, he reviewed NOPD police reports and photographs of the inside of Mr. Lorino’s apartment. He identified a living room picture featuring a pool of blood as well as blood spatter on the floor. He concluded that the assault occurred there and, from the size of the blood droplets, that Mr. Lorino had been stabbed with a knife.
 

 Mr. Sparks explained that the transfer impression on the wall correlated with NOPD incident reports indicating that Mr. Lorino’s body came to rest with his foot against the wall. From that presumption, he hypothesized from the blood spatter against the wall that the assault was a “close combat type incident” and that Mr. Lorino was upright at the time his blood impacted the wall. He also pointed out what he perceived to be a discontinuation in the blood spatter pattern that he associated with something having come between the source of the blood and the wall. He concluded that it was possible that the attacker(s) may have intercepted some of the blood spatter from Mr. Lorino, but he could not say definitively where on the attacker(s) body the blood spatter would have ended up.
 

 Defense counsel showed Mr. Sparks a photograph of the cutout from the white, red, and blue T-shirt made by Mr. Tafaro, and Mr. Sparks opined that the blood stain on the cutout was caused by a lateral transfer of blood and not by spatter impact. He also identified another area of blood spatter on the cutout that he concluded was most likely a swipe pattern and not an impact pattern. He noted that police reports had indicated that no blood was found on the defendants’ shoes, even though Mr. Lorino’s shoes were apparently saturated with blood. He identified what he concluded were drip stains on the floor of Mr. Lorino’s residence away from his body; he concluded that the stains could have been made |17by Mr. Lorino’s blood dripping from a perpetrator’s clothing or the murder weapon, or by a wounded perpetrator’s own blood.
 

 Mr. Sparks identified a blood drip stain on a bed sheet taken from another room of Mr. Lorino’s residence, which indicated to him that someone continued to drip blood away from the assault scene. He suggested that person was the possibly wounded perpetrator and stated the stain was important because it would contain his “genetic evidence of [his] presence on the scene.” Mr. Sparks also opined that NOPD technicians should have processed the knife drawer in the kitchen and the towels in which the knife was found for latent fingerprints, as well as the door through which the perpetrators exited the
 
 *1051
 
 house. He further stated that assailants often injure their hands or arms in close combat style knife attacks.
 

 On cross examination, Mr. Sparks acknowledged that he had been paid $1,700.00 to consult and testify for the defense, and he again admitted that he had never actually visited the crime scene. He also acknowledged that he had neither spoken to the Coroner’s Office nor viewed the victim’s body and that he was not an expert in pathology. Mr. Sparks confirmed that the photographs he examined to reach his conclusions were not ideal for blood stain analysis. He acknowledged that some of the blood stains used in coming to his conclusions could have been caused when Mr. Lorino’s body was moved during resuscitation efforts, as well as by Sergeant Matthews forcing the front door of the house open. Additionally, some blood stains could have been produced by someone running through the blood.
 

 Moreover, Mr. Sparks agreed that the chair, upon which he based his opinion that a “void” existed in the blood spatter pattern, could have been moved to the location in which it was photographed after the assault. He also [ ^acknowledged that the location of blood spatter on the clothing of an assailant would depend on the assailant’s relative location to the source of the victim’s blood, and that indeed evidence existed of the victim’s blood on the T-shirt worn by Thatcher on the day of the murder. Mr. Sparks also said that if the defendants were not wearing the shoes in question on the day of the murder, he would not expect blood to be on them. He testified that an assailant likely would not have injured himself if he were stabbing a victim one-handed while another person held the victim down. Finally, Mr. Sparks acknowledged that it would not be unusual for technicians to be unable to lift suitable prints from less than ideal surfaces.
 

 ERRORS PATENT
 

 A review for errors patent on the face of the records reveals none.
 

 TERRY’S ASSIGNMENT OF ERROR NUMBERS 1 AND 5
 

 THATCHER’S ASSIGNMENT OF ERROR NUMBER 1
 

 In these assignments of error, Terry and Thatcher argue the insufficiency of the evidence to prove their guilt beyond a reasonable doubt.
 

 When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated in
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
 
 See State v. Captville,
 
 448 So.2d 676, 678 (La.1984). That standard dictates that to affirm the conviction, an appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that the state proved all elements of the crime beyond a reasonable doubt.
 
 State v. Johnson,
 
 03-1228, p. 4 (La.4/14/04), 870 So.2d 995, 998;
 
 Captville,
 
 448 So.2d at 678. Further, when the conviction is based on circumstantial evidence, La. R.S. 15:438 sets forth the rule | iflthat “assuming every fact to be proved that the evidence tends to prove, in order to convict, [the circumstantial evidence] must exclude every reasonable hypothesis of innocence.” However, La. R.S. 15:438 does not establish a stricter standard of review than the more general rational juror’s reasonable doubt formula; rather it serves as a helpful evidentiary guide for jurors when evaluating circumstantial evidence.
 
 State v. Toups,
 
 01-1875, p. 3 (La.10/15/02), 833 So.2d 910, 912.
 

 It is not the function of the appellate court to assess the credibility of witnesses or reweigh the evidence.
 
 State v. Johnson,
 
 619 So.2d 1102, 1109 (La.App. 4th
 
 *1052
 
 Cir.1993),
 
 citing State v. Rosiere,
 
 488 So.2d 965, 968 (La.1986). Credibility determinations, as well as the weight to be attributed to the evidence, are soundly within the province of the fact finder.
 
 State v. Brumfield,
 
 93-2404, pp. 5-6 (La.App. 4 Cir. 6/15/94), 639 So.2d 312, 316. Moreover, conflicting testimony as to factual matters is a question of weight of the evidence, not sufficiency.
 
 State v. Jones,
 
 537 So.2d 1244, 1249 (La.App. 4th Cir.1989). Like all factual matters, credibility determinations are entitled to great weight and will not be disturbed unless contrary to the evidence.
 
 Id., citing State v. Vessell,
 
 450 So.2d 938 (La.1984). Absent internal contradiction or irreconcilable conflict with the physical evidence, a single witness’ testimony, if believed by the fact finder, is sufficient to support a factual conclusion.
 
 State v. Marshall,
 
 04-3139, p. 9 (La.11/29/06), 943 So.2d 362, 369.
 

 In support of their assignments regarding the insufficiency of the evidence, the defendants cite the lack of credibility of the state’s witnesses, the absence of physical or DNA evidence linking them to the crime, and the state’s failure to prove they possessed the specific intent to kill or inflict great bodily harm upon the victim.
 

 | apSecond-degree murder is defined in pertinent part as “the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm.” La. R.S. 14:30.1. La. R.S. 14:10(1) defines specific criminal intent as “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or his failure to act.” Specific intent may be inferred from the circumstances and actions of the defendant,
 
 State v. Williams,
 
 05-0459, p. 14 (La.App. 4 Cir. 1/18/06), 925 So.2d 567, 575, and can be formed in an instant.
 
 State v. Cousan,
 
 94-2503, p. 13 (La.11/25/96), 684 So.2d 382, 390. Specific intent to kill can be implied by the intentional use of a deadly weapon such as a knife or a gun.
 
 State v. Templet,
 
 05-2623, p. 15 (La.App. 1 Cir. 8/16/06), 943 So.2d 412, 421.
 

 Initially, the defendants complain that the jury was irrational in finding the state’s witnesses’ (Ms. McElveen and Mr. Tafaro) trial testimony credible to convict because it was uncorroborated.
 

 The defendants maintain that Ms. McEl-veen’s testimony was “unreliable, self-serving, [and] inconsistent;” that she was suicidal and completely “mentally unstable;” and that she was motivated by financial gain and the desire to avoid prosecution in testifying against Thatcher and Terry. Moreover, the defendants argue that the jury erred in relying on the testimony of Mr. Tafaro, whose racial bias and mental defects/illnesses rendered his testimony incredible.
 

 The defendants’ first ground for discrediting Ms. McElveen’s testimony is her admission under cross examination that she was drunk when she gave the statement to police in which she implicated her sons in Mr. Lorino’s murder.
 

 Under re-direct examination concerning this issue, Ms. McElveen emphatically stated that her drinking did not interfere with her certainty that her |21 sons committed the murder. She did admit that in her statement she told the police Terry was living with her on the day of the murder when in fact he was not. She also admitted that she lied to the police when she told them she was lying down when the defendants returned to her house. However, she steadfastly denied being unable to identify her sons as Mr. Lorino’s killers. Moreover, Detective Hoobler gave credence to Ms. McElveen’s claim that she correctly identified the defendants when
 
 *1053
 
 he testified that he did not detect any impediment to Ms. McElveen giving a statement. He further stated that had he suspected that Ms. McElveen was impaired in any manner, he would not have taken a statement from her. Ms. McEl-veen consistently said that Thatcher wore a blue T-shirt and Terry was dressed in a white T-shirt on the day of the murder. The clothing description Ms. McElveen supplied was the same given by Ms. Smith, and in fact, both shirts were covered in blood and later identified as having been found in the McElveen residence. Mr. Hernandez told the police that he saw two young, black males — one wearing a blue T-shirt and one a white T-shirt-running river bound toward the McElveen residence immediately following the murder. Major Little heard the defendants discussing who would “take” the murder charge after being arrested for the crime. Furthermore, Ms. McElveen’s statement to the police that the defendants returned home after the murder cut and covered in blood and took showers was supported by the physical and forensic evidence found in her residence. The most damning fact of all was that Mr. Lorino’s blood was found on a white T-shirt inside the McElveen residence.
 

 According to the defendants, the second ground for discrediting Ms. McElveen’s testimony is that she “based her testimony that her sons committed the murder on extraordinary precognitive abilities” that included seeing dead peoplej^and being able to predict the future. This assertion is a mischaracterization of Ms. McElveen’s testimony.
 

 At trial, Ms. McElveen said she was currently suffering some mental instability and taking prescribed medication; however, no testimony or evidence exists to suggest that she was plagued by her current mental problems at the time of Mr. Lori-no’s murder, let alone that she based her knowledge of the defendants’ involvement therein on her “precognitive abilities.” On the contrary, Ms. McElveen testified that she suspected her sons’ culpability based on their words and actions both before and after the murder, their coming home sweating and covered in blood, and their threat that they would kill her if she went to the police about it. Moreover, the defendants have not shown how the fact that she is or may have been suicidal affected her ability to accurately perceive the events of 9 September 2002.
 

 Their third argument in favor of discrediting Ms. McElveen’s testimony — that she had a financial interest in turning her sons in for the murder — was contradicted by her and Detective Matthews. Ms. McElveen testified that she (a) turned her sons in because she knew they had killed someone’s child; (b) turned them into police before calling Crimestoppers; and (c) gave away the entire $18,000.00 Crimes-toppers award. The jury also heard Detective Matthews’ testimony that he had already met with and interviewed Ms. McElveen by the time Crimestoppers informed him that the defendants had been arrested. The defendants’ argument, based only on their subjective suspicions as to Ms. McElveen’s true motivations, is legally insufficient to demonstrate that the jury was irrational in believing her.
 

 12-jThe jury apparently chose to believe Ms. McElveen’s imperfect but consistent, coherent, and corroborated testimony, which found sufficient validation in the surrounding testimonial, physical, and documentary evidence. Suffice it to say, the jury weighing the supporting and impeaching factors could rationally have found that what she said occurred actually took place.
 

 In the next part of this assignment of error, Terry argues that the district court erroneously excluded evidence relating to
 
 *1054
 
 Mr. Tafaro’s alleged racism and multiple personality disorder that the defendants sought to admit in order to impeach Mr. Tafaro’s testimony linking Terry to the murder. Specifically, Terry sought to impeach Mr. Tafaro with extrinsic evidence that (a) Mr. Tafaro had testified in a previous trial that he had the opportunity in his position to tamper with evidence; (b) Mr. Tafaro had written letters to a convicted murderer under a pseudonym expressing his belief that black defendants received preferential treatment to Caucasian defendants by Orleans Parish juries; and (c) those letters exposed a split personality. He argues that had the jury heard that evidence, it would have rendered Mr. Tafa-ro’s testimony — linking Mr. Lorino’s blood to a T-shirt found in the McElveen residence — so unreliable that no rational jury would have afforded it any weight.
 

 This court has already ruled on this issue. In response to the defendant’s motion, the district court’s held an ex parte evidentiary hearing during which the court received evidence from defense counsel pertaining to its impeachment evidence of Mr. Tafaro, based upon which it ruled that the defendant could impeach Mr. Tafaro with the letters Mr. Tafaro wrote under the pseudonym “Jim Taft.” The state sought supervisory writs to this court, which ruled that the
 
 ex parte
 
 hearing was an abuse of the district court’s discretion and further that the [^character evidence sought to be introduced by the defense was “irrelevant and immaterial” to the case
 
 sub judice. State v. McElveen,
 
 09-0284, unpub. (La.App. 4 Cir. 3/10/09),
 
 writ
 
 denied, 09-0533 (La.3/11/09), 5 So.3d 106. The defendants have presented no new evidence to show that these rulings were in error. Consequently, this claim is barred from consideration on appeal by the “law of the case” doctrine.
 
 [8]
 

 Nevertheless, Mr. Tafaro’s statement that black defendants enjoy preferential treatment by Orleans Parish juries over Caucasian defendants was not admissible to show bias. The statement does not evidence any racial bias against African-Americans on his part; rather, it establishes his view that it is Orleans Parish
 
 jurors
 
 who hold a racial bias. Nor does the statement suggest that Mr. Tafaro would tamper with evidence to ensure that black defendants were convicted.
 

 The claim regarding Mr. Tafa-ro’s “severe mental defects” is equally baseless, as any evidence relating to Mr. Tafaro’s alter-ego, “Jim Taft,” was inadmissible for impeachment purposes
 
 ab ini-tio.
 
 Chief among concerns about a witness’ mental state is the extent to which a defect thereof would impede the witness’ capacity to accurately observe, remember, or recount matters. In this Incase, defense counsel questioned Mr. Tafaro outside the presence of the jury prior to his
 
 *1055
 
 testimony regarding the allegations that he suffered from multiple personalities. Mr. Tafaro testified that “Jim Taft,” the alter ego described in his letters, was in fact “a pen name” who was “a fantasy relative to some writing that [he’d] done.” Moreover, at trial, Mr. Tafaro was qualified as an expert in serology, and his testimony was consistent throughout and displayed no signs of confusion, nonsense, or alternate personalities.
 

 The letters relied on by defense counsel to support this theory were written several years prior to Mr. Lorino’s murder. No evidence exists of a medical or psychiatric diagnosis of Mr. Tafaro suffering from any personality disorder, let alone one that has caused his professional credentials to be revoked or any other form of professional discipline relating to a mental defect. Thus, the evidence relating to Mr. Tafaro’s alleged multiple personalities was irrelevant for purposes of impeachment and was properly excluded by the trial court.
 

 In the final claim under their insufficiency of the evidence argument, the defendants contend that the jury ignored the fact that neither Thatcher’s nor Terry’s DNA was found at the crime scene or on the murder weapon. They also claim that the jury acted irrationally when it failed to consider that and overlooked the complete lack of physical and/or eyewitness evidence linking them to Mr. Lorino’s murder. They argue that the only evidence linking them to the crime is Major Little’s testimony that the defendants and their brother (Elton McElveen) discussed who would “take” the murder charge, Ms. McElveen’s “dubious” testimony, and a single spot of Mr. Lorino’s blood, which the defendants suggest that Mr. Tafaro and/or Detective Hoobler manipulated/planted on the white T-shirt collected from the McElveen residence after the murder. The defendants cite the 126testimony given by the expert, Mr. Sparks, who opined that an “analysis of the crime scene” must have shown the victim’s blood spattered over the defendants’ clothes and the presence of the assailants’ DNA. In short, the defendants claim that the facts implicate, accuse, and indict an unknown third party, not them.
 

 All the evidence points to the defendants as the individuals who stabbed Mr. Lorino to death. The jury was not unreasonable in inferring from the method of killing Mr. Lorino, coupled with the multiple stab wounds, that the defendants acted with the specific intent to kill or cause Mr. Lorino great bodily harm.
 
 See State v. Templet,
 
 05-2628 (La.App. 1 Cir. 8/16/06), 943 So.2d 412.
 

 The defendants have failed to meet their burden of demonstrating that the evidence adduced at trial was insufficient to exclude every reasonable hypothesis of innocence such that no rational juror, viewing the evidence in the light most favorable to the prosecution, could have found that the state had proved beyond a reasonable doubt that the defendants committed the second-degree murder of Mr. Lorino. These assignments of error have no merit.
 

 THATCHER’S ASSIGNMENTS OF ERROR NUMBERS 2 AND 3
 

 By his second assignment of error, Thatcher argues that the state imper-missibly used its peremptory juror strikes to dismiss a number of African-American venire persons during jury selection, and, after the trial court ruled that the defendant had made a
 
 prima facie
 
 showing of a racially discriminatory pattern of strikes, failed to offer race-neutral reasons for the peremptory challenges. In his third assignment, Thatcher alleges that the trial court erroneously failed to find a second
 
 prima facie
 
 pattern of discrimination at the end of the jury selection. In making a
 
 Batson v. Kentucky,
 
 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), challenge,
 
 *1056
 
 a defendant must first make a
 
 prima facie
 
 showing of discrimination in the prosecutor’s use of a peremptory strike. U.S.C.A. Const. Amend. 14. If the defendant is unable to make out a
 
 prima facie
 
 case of racial discrimination, then the
 
 Batson
 
 challenge fails, and it is not necessary for the prosecutor to articulate “race-neutral” explanations for his strikes.
 
 State v. Green,
 
 94-0887, p. 24 (La.5/22/95), 655 So.2d 272, 287-88.
 

 Once the opponent of a peremptory challenge has made out a
 
 prima facie
 
 case of racial discrimination (step one), the burden of proof shifts to the proponent of the strike to come forward with a race-neutral explanation (step two).
 
 Purkett v. Elem,
 
 514 U.S. 765, 767, 115 S.Ct. 1769, 181 L.Ed.2d 834 (1995). The second step of this process does not demand an explanation that is persuasive, or even plausible. Rather, the issue is the facial validity of the prosecutor’s explanation. “Unless a discriminatory intent is inherent in the prosecutor’s explanation, the reason offered will be deemed race neutral.”
 
 Hernandez v. New York,
 
 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination.
 
 Purkett,
 
 514 U.S. at 767, 115 S.Ct. 1769;
 
 Hernandez,
 
 500 U.S. at 358-59, 111 S.Ct. 1859;
 
 Batson,
 
 476 U.S. at 96-98, 106 S.Ct. 1712.
 

 The combination of factors needed to establish a
 
 prima facie
 
 case are: (1) the defendant must demonstrate that the prosecutor’s challenge was directed at a member of a cognizable group; (2) the defendant must then show the challenge was peremptory rather than for cause; and (3) the defendant must show circumstances sufficient to raise an inference that the prosecutor struck the venire person on account of being a member of that cognizable group.
 
 Batson,
 
 476 U.S. at 96, 106 S.Ct. 1712. The
 
 Batson
 
 court also noted that relevant facts or circumstantial evidence of discriminatory intent include proof of disparate impact and a “pattern” of strikes [asagainst jurors, as well as, questions and statements made during voir dire.
 
 Id.
 
 at 96-97, 106 S.Ct. 1712.
 

 In
 
 State v. Green,
 
 94-0887, p. 24 (La.5/22/95), 655 So.2d 272, 287, the Court held that the sole focus of the
 
 Batson
 
 inquiry is upon the intent of the prosecutor at the time he exercised his peremptory strikes. The Court went on to outline several factors that could lead to a finding that a
 
 prima facie
 
 case has been made pursuant to
 
 Batson:
 

 The defendant may offer any facts relevant to the question of the prosecutor’s discriminatory intent to satisfy this burden. Such facts include, but are not limited to, a pattern of strikes by a prosecutor against members of a suspect class, statements or actions of the prosecutor which support an inference that the exercise of peremptory strikes was motivated by impermissible considerations, the composition of the venire and of the jury finally empaneled, and any other disparate impact upon the suspect class which is alleged to be the victim of purposeful discrimination.
 

 Green,
 
 p. 24, 655 So.2d at 288 (La.1995).
 

 Thatcher is African-American. Following voir dire, he alleged that the state exercised race-based peremptory strikes against five African-American members of the jury venire, to-wit: Shannon Johnson, Lorraine Chaney, Ethelyn Webb, Larry Walker, and Demetrius Smith. The trial court ruled that defense counsel made a sufficient
 
 prima facie
 
 showing of discriminatory challenges and sought the prosecution’s race-neutral reasons for its exercise of its peremptory strikes against the five
 
 *1057
 
 perspective black jurors.
 
 [9]
 
 Upon the state’s proffer, the trial court ruled that the stated reasons were race-neutral and denied the defendant’s
 
 Batson
 
 challenge.
 

 1
 
 Shannon Johnson
 

 On appeal, Thatcher argues that the state’s proffered race-neutral reasons were insufficient. Although he claims that the record “does not support the prosecutor’s race-neutral reasons” for striking Shannon Johnson (“Ms. Johnson”), the record indicates otherwise. Ms. Johnson said she would attempt to apply the law given by the trial judge, but she also said she believed police officers do and would plant evidence. The record does not indicate that Ms. Johnson was rehabilitated as to that position.
 

 In this case, physical evidence collected by the police was vital to the state’s case, and where the defense was centered on the theory that the police planted a crucial piece of evidence that linked a defendant to the murder of Mr. Lorino, the inclusion of a juror who displays such distrust of police integrity would be prejudicial to the prosecution’s chances of a fair trial. The use of a peremptory strike against Ms. Johnson, regardless of her race, was therefore “clear, reasonable, specific, legitimate and related to the particular case at bar.”
 
 State v. Collier,
 
 553 So.2d 815, 820 (La.1989).
 

 Lorraine Chaney
 

 The prosecution’s notes indicated that Lorraine Chaney (“Ms. Chaney”) was rolling her eyes during the state’s voir dire and appeared disinterested in the proceedings; however, she perked up when the defense attorneys conducted their juror examination. Ms. Chaney also indicated that she would have problems believing police officer testimony, and that they “lie and can plant evidence.” Although the defendant noted that Ms. Chaney had a friend who was a member of the parish sheriffs office and rated the NOPD very highly, those factors are not | ^indicative that she would view the state’s case more favorably, and do not make up for her inclination to believe that police can plant evidence, especially in a case, as noted above, where that issue was a critical factor in determining the weight and credibility of the state’s most damning piece of evidence. Coupled with her body language, prosecutors had legitimate race-neutral reasons for peremptorily challenging Ms. Chaney, and the trial court was not unreasonable in accepting those reasons.
 

 Ethelyn Webb
 

 The defendant acknowledges that no record evidence exists regarding the state’s reasons for a peremptory challenge against Ethelyn Webb (“Ms. Webb”), and that the trial court found the state’s race neutral reasons to be acceptable. On the showing made, the defendant has failed to meet his burden of demonstrating the unreasonableness of the trial court’s ruling regarding Ms. Webb, where the only factor mitigating toward the impermissible use of a strike against her is her presumptive race.
 

 Larry Walker
 

 The state noted that Larry Walker (“Mr. Walker”), like Ms. Chaney, was uninterested in participating in voir dire. He was slouched over and had bad body language. Not until the defense began its inquiry, did he display any interest in the proceedings. Prosecutors also noted that he changed his answer to questions regarding the age of his own children. The
 
 *1058
 
 defendant has not shown any statements or actions by the prosecutors that would permit an inference that their challenge to Mr. Walker was motivated by impermissible motivations. Beyond the hi mere presumption that Mr. Walker is an African-American, the defendant notes that Mr. Walker participated in one question about proof of identity to show the unreasonableness of the trial court in accepting the state’s race-neutral reasons for exercising a peremptory strike against him.
 

 Demetrius Smith
 

 Finally, the prosecution’s notes reflect that Demetrius Smith (“Mr. Smith”) gave inconsistent answers on his juror questionnaire and in voir dire regarding the number of children he had— three versus four — and that he could not recall the names of the schools his children attended. The defendant again fails to provide any evidence countering the prosecution’s race-neutral reasons for dismissal and points to nothing, beyond Mr. Smith’s presumptive race, to support his contention that the state exercised a peremptory strike against him based on impermissible considerations.
 

 Although the trial court sided with the defendant in finding that he had made a sufficient
 
 prima facie
 
 showing of a discriminatory pattern of peremptory strikes, it ultimately found the state’s reasons for doing so sufficiently race-neutral. It is therefore incumbent on the defendant to show that the trial court’s ruling was unreasonable in light of the record. He has failed to do.
 

 In
 
 State v. Green, supra,
 
 the Supreme Court found that prosecutors’ use of peremptory challenges to exclude African-American jurors did not constitute a
 
 Bat-son
 
 violation under a factual scenario practically identical to this case:
 

 Melvin Green’s evidence of purposeful discrimination, while sufficient to make his prima facie case, is a relatively weak one. The entirety of the defendant’s case rests upon the following facts: that the State exercised eleven (11) out of twelve (12) peremptory strikes on black jurors, that the final jury | ^composition was eight (8) whites and four (4) blacks, and that the defendant himself was black. The defendant has failed to describe the racial composition of the entire venire, information which might have allowed us to draw conclusions based upon a wider appreciation of the “disparate impact” upon prospective black jurors caused by the prosecutor’s actions ... Purkett In addition, the defendant has failed to direct our attention to any particular statements, or any specific pattern of strikes or pattern of questioning within a specific jury panel, which might support an inference of discriminatory purpose. Nor does the late hour of the defendant’s
 
 Batson
 
 objection, after the jury had been selected and sequestered, help to cast the defendant’s challenge in a favorable light. While ultimately the question we are concerned with is the veracity of the prosecutor, circumstances such as these help paint the context in which the prosecutor’s statements are evaluated, and we are not unmindful that the ultimate burden of proof in this case rests not upon the prosecutor to disprove his discriminatory intent, but rather upon the defendant to prove it.
 

 Green,
 
 p. 27, 655 So.2d at 289, n. 23.
 

 The facts and failings of the defendant’s
 
 Batson
 
 claims are very similar to those raised in
 
 Green.
 
 Because the “ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike,”
 
 Purkett, supra,
 
 the defendant herein, like in
 
 Green,
 
 has failed, on the showing made, to demon
 
 *1059
 
 strate that the trial court was unreasonable in accepting the state’s race-neutral reasons for exercising peremptory strikes against the five complained-of jurors in response to his
 
 Batson
 
 challenge.
 

 This assignment of error has no merit.
 

 In his third assignment of error, the defendant claims that the trial court erred in finding, at the conclusion of voir dire, that he had not established a
 
 prima facie
 
 case of discrimination where he alleged that prosecutors had exercised twelve of its strikes against African-American venire persons. For the same reasons discussed above, the defendant’s claim has no merit. He cites only to the fact that the state used twelve of its strikes against African-American potential jurors in ^support of his contention. However, as noted by the United States Fifth Circuit in
 
 United States v. Branch,
 
 989 F.2d 752, 755 (5th Cir.1993), while the racially discriminatory striking of even one minority juror will violate
 
 Batson,
 
 a defendant must prove discrimination by more than the sole fact that the minority venire-person was struck by peremptory challenge. Accordingly, on the showing made, the defendant has failed to demonstrate that the trial court was unreasonable in finding that he had not met his
 
 prima facie
 
 burden of proof.
 

 This assignment error likewise is merit-less.
 

 TERRY’S ASSIGNMENTS OF ERROR NUMBERS 2 AND 3
 

 In these two related assignment of errors, the defendant claims that the state used its peremptory strikes to improperly dismiss eight African-American venire persons during jury selection, and, after the trial court ruled that the defendant had made a
 
 prima facie
 
 showing of a racially discriminatory pattern of strikes, failed to offer sufficient race-neutral reasons for its peremptory challenges. Further, he alleges that the trial court improperly failed to find a second
 
 prima facie
 
 pattern of discrimination at the end of jury selection.
 

 In discussing Thatcher’s assignments of error regarding
 
 Batson
 
 above, we stated what a defendant is required to show and what the prosecution must show to rebut. The same standards apply to Terry’s
 
 Bat-son-related
 
 argument. In order to establish a
 
 prima facie
 
 case of a discriminatory use of peremptory strikes, “a defendant must prove discrimination by more than the sole fact that the minority venire person was struck by peremptory challenge.”
 
 Branch,
 
 989 F.2d at 755. In support of a
 
 prima facie
 
 case, a defendant must supply evidence as set forth in
 
 Green,
 
 655 So.2d at 288, noted above.
 

 | .^Discriminatory intent may be found, for example, if the reasons proffered by prosecutors for excusing a minority juror apply equally as well to a non-minority juror who is not struck; if prosecutors ask questions of minority jurors that are designed to elicit disqualifying answers; and by the prosecution’s use of off-the-record tactics, such as arbitrary jury shuffle, which serves to delay the consideration of minority jurors until the final jury has largely been selected.
 
 See Miller-El v. Dretke,
 
 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). The Supreme Court has recognized that “a retrospective comparison of jurors based on a cold appellate record may be very misleading,” and therefore admonishes appellate courts to be mindful that “an exploration of the alleged similarities at the time of trial might have shown that the jurors in question were not really comparable.”
 
 Snyder v. Louisiana,
 
 552 U.S. 472, 483, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008).
 

 
 *1060
 
 A venire person’s demeanor and body language may be legitimate race-neutral bases on which the state may exercise a peremptory challenge.
 
 See State v. Hoffman,
 
 98-3118, p. 15 (La.4/11/00), 768 So.2d 542, 559-60. Where a venire person’s demeanor is offered as a reason for striking him, “the trial court must evaluate not only whether the prosecutor’s demean- or belies a discriminatory intent, but also whether the juror’s demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor.”
 
 Snyder,
 
 552 U.S. at 477, 128 S.Ct. 1203. A demeanor-based race-neutral reason is strengthened:
 

 if the attorney is able to articulate an objective fact, such as that the juror was slow in answering questions or had to have questions repeated ... [but] the judge is free, based upon all the information presented and that judge’s eyewitness observation of counsel, to conclude that the reason is offered in good faith and not as a subterfuge for race.
 

 Is
 
 United States v. Bentley-Smith,
 
 2 F.3d 1368, 1375 (5th Cir.1993). Such credibility determinations lay “peculiarly within a trial judge’s province,”
 
 Hernandez v. New York,
 
 500 U.S. 352, 365, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion), quoting
 
 Wainwright v. Witt,
 
 469 U.S. 412, 428, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), and, “in the absence of exceptional circumstances,”
 
 Hernandez,
 
 500 U.S. at 366, 111 S.Ct. 1859, appellate courts should defer to the determination of the trial court in its broad discretion.
 
 Id.; Hoffman,
 
 p. 15, 768 So.2d at 559.
 

 The defendant argues that the prosecutor’s pattern of peremptory strikes against African-American venire persons evidence a clear discriminatory intent to have excluded eight particular jurors solely based on their race. Initially, we note that the defendant’s contention regarding the state’s use of its first seven strikes against African-American venire persons is irrelevant; that evidence served only to satisfy the trial court that he had made a
 
 prima facie
 
 showing of discrimination requiring the prosecution to offer race-neutral reasons for having exercised those strikes. The trial court found the proffered reasons to be sufficiently race-neutral in the final analysis, and it is that factual finding that the defendant assigns as error herein.
 

 The first two panels contained a total of forty venire persons, of which twenty were African-American, nineteen Caucasian, and one of unknown origin.
 
 [10]
 
 By the end of the second voir dire panel, when the defendant raised his
 
 Batson
 
 objection, seven — four Caucasians and three African-Americans — had been selected for the trial jury. Nine jurors — five Caucasians and four African American-were excused for cause. Prosecutors challenged three jurors — two African-American and one Caucasian — for cause; the trial court granted the cause challenge against the Caucasian juror. The state exercised nine peremptory challenges — eight against the complained of African-American venire persons and one against a Caucasian veni-re person. The defense used fourteen peremptory challenges — eight against Caucasians, five against African-Americans, and one against a venire person of unknown race. The trial court found a
 
 prima facie
 
 showing of discrimination in the state’s use
 
 *1061
 
 of its peremptory challenges; however, it ultimately found the state’s proffered race-neutral reasons sufficient and denied the
 
 Batson
 
 objection.
 

 The final panel contained thirteen African-Americans, six Caucasians, and one Latino venire person. The state exercised its remaining eight peremptory challenges — seven against African-Americans and one against the Latino venire person. The defense used five peremptory challenges — all to strike Caucasians. The final jury was comprised of eight African-Americans and four Caucasians jurors. The defendant re-raised a
 
 Batson
 
 objection, upon which the trial court found that he had not made a sufficient
 
 prima facie
 
 showing of discrimination in the state’s use of its peremptory challenges.
 

 All told, 55% (thirty-three in number) of the sixty venire persons across the three panels had been African-Americans, 42% (twenty-five in number) Caucasians, and 3% (two in number) of other origins. The state used its peremptory challenges to excuse 45% of African-American venire persons. The defense used its peremptory challenges to excuse 52% of Caucasian ve-nire persons. The state completed jury selection with seven unused peremptory strikes. While the defendant cites to
 
 Miller-El
 
 to argue that the state’s use of its peremptory challenges to excuse that many African-American venire persons |S7evidences a racial disparity that “[h]ap-penstance is unlikely to produce,”
 
 see Miller-El,
 
 545 U.S. at 241, 125 S.Ct. 2317, the factual scenario in this case is readily distinguishable from that confronting the United States Supreme Court in
 
 Miller-El.
 

 In
 
 Miller-El,
 
 the Court noted that prosecutors had used their peremptory challenges “to exclude 91% of the eligible African-American venire members,”
 
 id.,
 
 noting that only one of the original twenty African-American members of the venire had been selected to serve on the jury. In the instant case, over half of the African-American venire persons remained on the panel following the state’s peremptory challenges and 67% of the final jury were African-American. Such figures do not represent the sort of disparity as in
 
 Miller-El
 
 or those found to be indicative of the discriminatory use of strikes in other notable cases.
 
 See Batson
 
 (all African-Americans struck by prosecution);
 
 Snyder
 
 (all African-Americans struck). Additionally, the fact that prosecutors used only seventeen of their twenty-four available peremptory challenges, and thus could have struck an additional seven of the eight African-American jurors had it so desired, militates against a finding of the discriminatory use of peremptory challenges by the state.
 

 The defendant acknowledges pure statistics are not conclusive of purposeful racial discrimination. To that end, the defendant argues that the prosecutors’ true impermissible intentions as to African-American jurors is evidenced in the insufficient reasons proffered for their exercising the challenges against eight particular African-American venire persons, the disparate treatment between African-American and Caucasian venire persons who gave the same answers to voir dire questions, and the implausible nature of the prosecution’s race-neutral reasons for excusing the complained of venire persons. The evidence offered by 138the defendant, however, is insufficient to sustain a finding that the trial court abused its discretion in finding no discriminatory intent.
 

 Shannon Johnson
 

 The defendant claims that the state’s proffered reasons for striking Ms. Johnson were insufficient to rebut the
 
 Bat-son
 
 presumption. Specifically, he argues that one of these reasons — that she had
 
 *1062
 
 not assured prosecutors that she could follow the law — “gives pause.” Moreover, he asserts that Caucasian venire persons who were not struck by the state gave similar answers as to their ability to convict upon testimonial evidence, their nervousness in dealing with police, and their belief that police sometimes plant evidence. Thus, the defendant concludes that Ms. Johnson was treated disparately because of her race.
 

 In response to the defendant’s
 
 Batson
 
 objection, prosecutors stated that Ms. Johnson had been excused due to their concerns over whether she could follow the law, her concerns that police planted evidence, and her stated nervousness about dealing with police.
 
 [11]
 
 The record of Ms. Johnson’s voir dire responses supports the state’s race-neutral reasons for exercising a peremptory challenge against her.
 

 Ms. Johnson agreed with defense counsel’s suggestion that the lack of an eyewitness who could positively identify the perpetrators would increase the importance of physical evidence from the crime scene, the existence of other testimonial witness notwithstanding, and further that the lack of DNA or fingerprint evidence on the murder weapon would tend to prove that the defendant |S3did not commit the crime. Thus, her declaration to the contrary notwithstanding, her affirmative responses to defense counsel’s questions evidence her inability and/or unwillingness to follow the law, which requires jurors to convict if they find the testimony alone sufficient to prove guilt beyond a reasonable doubt. In light of the countervailing evidence, prosecutors were not required to take her one-word affirmation that she could follow the law at face value.
 
 See Uttecht v. Brown,
 
 551 U.S. 1, 18, 127 S.Ct. 2218, 167 L.Ed.2d 1014 (2007) (“Juror Z’s assurances that he would consider imposing the death penalty and would follow the law do not overcome the reasonable inference from his other statements that in fact he would be substantially impaired in the case because there was no possibility of release; his assurances did not require the trial court to deny the state’s motion to excuse Juror Z.”).
 

 Moreover, Ms. Johnson’s answers were not comparable to those given by Caucasian jurors whom the defendant complains were not similarly excused by the state. John Houston (“Mr. Houston”), a Caucasian venire person who served on the jury, never stated, as claimed by the defendant in his brief, that “one eyewitness would not be enough for him to convict.” In fact, Mr. Houston never mentioned
 
 anything
 
 about eyewitnesses. Rather, his actual statement was, “I can convict on testimony but probably just not from one [witness]. I would probably have to have more than one.” This is a far cry from Ms. Johnson’s indication that the lack of an identifying eyewitness and DNA/fingerprint evidence would cause her to acquit the defendant. Likewise, prosecutors were legitimately less inclined to be concerned by the statement of Daniel Muhs (“Mr. Muhs”), another Caucasian venire person who served on the jury, that he thought he would like more than just testimony alone, as he did not indicate that he would require an identifying eyewitness in order to convict.
 

 h0Most crucially, Ms. Johnson agreed that the planting of evidence by police officers is not just a possibility but actually happens. Contrary to the defendant’s assertion, Ms. Johnson’s answer stands out
 
 *1063
 
 from that of Diane Chesson, a Caucasian member of the venire not struck by the state, who, even in the face of specific questioning by defense counsel as to whether the planting of evidence actually happens, continued to maintain only that it was possible. Despite the defendant’s similar contention, Mr. Houston did not agree as readily that it was possible that police officers sometimes planted evidence. In fact, unlike Ms. Johnson’s agreement to that end, Mr. Houston qualified his statement by noting that, “I would have to be convinced of that, obviously.” Mr. Houston presented as a notably more agreeable juror for the state due to his heightened resistance to defense allegations that key police witnesses had planted evidence linking the defendant to Mr. Lorino’s murder, not due to his race.
 

 Caucasian venire person Phillip Dubos, who was not struck by the state, agreed that police may plant evidence but acknowledged that, “I haven’t seen a case [where that had happened].” Like Mr. Houston, Mr. Dubos evidenced a higher level of scrutiny toward defense theories that police framed the defendants for the instant crime, and was thus a more favorable juror than Ms. Johnson in that regard. This distinction between potential jurors’ tendencies to believe that police might plant evidence was critical in a case in which the defense’s theory was that the key piece of evidence linking the defendant to the crime was fabricated by Detective Hoobler and Mr. Tafaro. Those venire persons, such as Ms. Johnson, who more readily might believe that to be the case, were therefore validly struck by prosecutors for reasons entirely unrelated to their race.
 

 |41Prosecutors also cited Ms. Johnson’s statement that she would be more nervous coming into contact with police as a justification for striking her. Not only was that a relevant basis for exclusion in a case where jurors’ trust in the police was critical to the state’s ability to prove its case, but also her answers regarding that issue did not mirror other venire persons who were not struck by prosecutors. In fact, the answers of Caucasian venire persons, represented by the defendant in his brief as being similar to Ms. Johnson’s, were given by them in response to a factually different hypothetical than posed to her. Ms. Johnson was asked if she would be more nervous or less nervous when confronted by a police officer who had just stopped her for a moving violation. While the defendant cites Mr. Muhs’ similar response that he would also be nervous when confronted by police, he fails to note that Mr. Muhs was asked if he would be nervous “[i]f you were being questioned for a murder, God forbid ... [a]nd they tell you are looking at life imprisonment and are going to be going to Angola.” On its very face, the context in which Mr. Muhs acknowledged his nervousness when dealing with police is vastly different from the scenario — a speeding ticket — in which Ms. Johnson stated that she would be nervous.
 

 In any event, the mere fact that two jurors of different races, one of whom is selected for jury service and the other of whom is not, offer similar answers to one or more of a dozen or so questions posed to them during a lengthy voir dire is irrelevant; any two given jurors, regardless of race, are likely to agree on some issues raised during the process, especially when, as here, many of the questions put to them are binary, yes or no questions. When similar answers are given to questions relating to noncritical, ancillary, or merely threshold matters, it is reasonable for a trial court to find that the state’s decision to strike one and not the |4aother did not rely on the answers to such questions, especially where the answers differed on more important issues. Even assuming
 
 *1064
 
 that Ms. Johnson’s response regarding her ability to convict based solely on testimonial evidence was similar to those given by Caucasian jurors, the state nevertheless presented ample physical and documentary evidence linking the defendants to the murder. Thus, a particular juror’s feelings on that issue were not significant to the state’s ability to prove its case.
 

 Based on “[t]he whole of the voir dire testimony,” in light of the legitimate issues involved in the case, the evidence as to Ms. Johnson does not support the conclusion that “race was significant in determining who was challenged and who was not.”
 
 Miller-El,
 
 545 U.S. at 252, 125 S.Ct. 2317. The defendant’s
 
 Batson
 
 claim with regard to her fails.
 
 [12]
 

 Lorraine Chaney
 

 The defendant claims that prosecutors’ proffered reasons for exercising a peremptory strike on Ms. Chaney — that she had problems with police officer testimony, believed that police lied and planted evidence, and that her body language indicated her lack of interest and her antagonism toward the state — were pretexts for racial discrimination. As with Ms. Johnson, the defendant failed to show that the trial court erred in finding credible the state’s race-neutral reasons for challenging Ms. Chaney.
 

 When asked by defense counsel how the state had to prove its case, she responded that “they have to have evidence and they also need witnesses.” ^Furthermore, Ms. Chaney, like Ms. Johnson, stated that she could not convict on testimony alone if none of that testimony came from someone who actually witnessed the crime, stating that the state’s case then “would have to be on the evidence.” She was never rehabilitated on that point. Her stated belief that the state was required to present both testimony and tangible evidence signaled — contrary to her earlier one-word affirmation that she could do so — her inability to follow the law in Louisiana that even a single witness’ testimony, if believed by the trier of fact, suffices to sustain a finding of guilt.
 
 See State v. Robinson,
 
 02-1869 (La.4/14/04), 874 So.2d 66. It formed a legitimate, race-neutral reason to strike her.
 

 Ms. Chaney’s response set her apart from Caucasian venire persons who gave answers during the same line of questioning. Ms. Chesson agreed that DNA evidence would become more important in the absence of an eyewitness, but never indicated that she would require, or be unable to convict without, such evidence. She also affirmed when asked by prosecutors, that she could convict without such evidence, and affirmed when asked by prosecutors that she could convict on testimony alone. Mr. Houston, as noted above, also stated that he could convict on testimony alone and made no statements — unlike Ms. Chaney — to give prosecutors pause in accepting that assurance by him. Rather, Mr. Houston stated that DNA evidence would become important if that were the only evidence produced, which does not indicate his inability to convict on testimony or a preference for physical evidence over testimony. Mr. Dubos likewise expressed his ability to convict on testimony alone and did not make any statements to the contrary. His greatest deviation from his earlier assurance was his giving DNA as an example of the type of physical evidence he would like to see; however, this 144was in response to a question put to him specifically about physical evidence,
 
 *1065
 
 and thus it did not implicate his ability to convict based on nonphysical evidence.
 

 More critically, Ms. Chaney, like Ms. Johnson, expressed her belief that police officers can plant evidence “because they are all human.” As discussed above, in a case that hinged on the credibility of police with regard to the single most damning piece of physical evidence implicating the defendant in Mr. Lorino’s murder, such a belief rendered Ms. Chaney a legitimate candidate to be challenged by the state.
 

 The prosecutions’ race-neutral rationale for striking Ms. Chaney, as with Ms. Johnson, had a legitimate basis in the state’s trial strategy.
 
 See Miller-El, supra.
 
 Based on “[t]he whole of the voir dire testimony,” in light of the legitimate issues involved in the case, the evidence as to Ms. Chaney does not support the conclusion that “race was significant in determining who was challenged and who was not.”
 
 Miller-El,
 
 545 U.S. at 252, 125 S.Ct. 2317. The defendant’s
 
 Batson
 
 claim as to Ms. Chaney fails.
 

 Larry Walker
 

 The defendant next contends that the state’s proffered reasons for striking Larry Walker — that he had given two different ages for his son in response to voir dire questioning and that his demeanor caused prosecutors concern — were likewise pretexts for racial discrimination.
 

 The defendant is correct that Mr. Walker giving conflicting answers as to the age of his son is not supported by the record. As defense counsel appeared to be pointing out during the
 
 Batson
 
 hearing, before being cut off by the court, only he had asked Mr. Walker how old his son was and only one age was given. We find |45no indication, however, that the prosecutor’s faulty recollection as to Mr. Walker’s misstatement of his son’s age was anything other than a good-faith mistaken remembrance of one of Mr. Walker’s sixty responses. Defense counsel made no such accusation and, more importantly, the trial judge did not find any attempt at subterfuge on the part of the prosecutor. Nor does the defendant argue on appeal that the prosecutor’s demeanor was reflective of his intent to exclude Mr. Walker because of his race.
 
 See Moody v. Quarterman,
 
 476 F.3d 260, 272 (5th Cir.2007) (defendant failed to substantiate allegation that prosecutor’s use of peremptory strike was unsupported by record where he “did not argue that the prosecutor’s demeanor demonstrated that his reasons for striking [the juror] were pretextual.”).
 

 In any event, the Court, in
 
 Rice v. Collins,
 
 546 U.S. 333, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006), “effectively held
 
 Miller-El
 
 does not mean the failure of one or more of the state’s articulated reasons for striking a prospective juror compels a trial judge to find the state’s remaining articulated race-neutral reasons necessarily cloaked discriminatory intent.”
 
 State v. Elie,
 
 05-1569, p. 6 (La.7/10/06), 936 So.2d 791, 796. Mr. Walker’s purported inconsistent responses were but one of several specific reasons given by prosecutors for excusing him. They also noted that he did not engage with prosecutors during voir dire, but rather more actively engaged defense counsel; he was quiet through the proceedings; his body language signaled that he was disinterested in the process; and he had his eyes closed on a number of occasions.
 

 As the prosecutor stated in chambers, each of the above provided an adequate basis for striking Mr. Walker based on his demeanor. Defense counsel took issue with the prosecution’s claims regarding Mr. Walker’s demeanor and specifically his reticence, noting that “[h]e was quiet with respect to both of us.” |4fiThe record reflects that while Mr. Walker was indeed quiet through the proceedings, he was
 
 *1066
 
 more actively engaged with the defense voir dire, participating in two multiple-question back-and-forth exchanges with defense counsel.
 

 While defense counsel argued that Mr. Walker’s being quiet was an insufficient basis to strike him, the trial court found, correctly, that his reserve was “not inappropriate for consideration.” Having observed voir dire and heard the arguments from both parties, the trial court acknowledged the legitimacy of the state’s concerns over Mr. Walker’s reticence. Moreover, the trial court noted that the state “ha[d] offered additional criteria” — namely, his purported misstatements, his “perking up” during the defense voir dire, his disinterested body language, and his closing his eyes during the questioning process.
 

 Jurisprudence establishes that body language, such as slouching or closing the eyes, may indicate that a venire person is not interested in taking his duty as a juror seriously and forms a legitimate race-neutral reason for exercising a peremptory strike.
 
 See State v. Seals,
 
 95-0305 (La.11/25/96), 684 So.2d 368 (body language, lack of eye contact, and juror inattention are legitimate, race-neutral, demeanor-based reasons for striking a juror);
 
 State v. Manuel,
 
 517 So.2d 374 (La.App. 5th Cir.1987) (juror properly struck where the juror seemed unresponsive and uninterested).
 
 See also Purkett,
 
 514 U.S. at 769, 115 S.Ct. 1769 (“What
 
 [Batson
 
 ] means by a legitimate reason’ is not a reason that makes sense, but a reason that does not deny equal protection.”). The prosecution’s lack of discriminatory intent is further bolstered by its conscious decision not to exercise seven of their fifteen remaining peremptory challenges after Mr. Walker’s panel, which would have been more than sufficient to strike the five African-American venire persons selected from the third panel to round out the trial jury.
 

 147Based on “[t]he whole of the voir dire testimony,” in light of the legitimate issues involved in the case, the evidence as to Mr. Walker does not support the conclusion that “race was significant in determining who was challenged and who was not.”
 
 Miller-El,
 
 545 U.S. at 252, 125 S.Ct. 2317. The defendant has not shown that the trial court abused its discretion in accepting the state’s race-neutral reasons for striking Mr. Walker and the
 
 Batson
 
 claim against him fails.
 

 Demetrius Smith
 

 Next, the defendant claims that the state’s reason for exercising a peremptory strike on Mr. Smith — that he gave conflicting answers to the number of children he had and could not remember where they went to school — represents a pretext for discrimination based on a disparaging stereotype regarding African-American men.
 

 The state’s first proffered reason for exercising a strike against Mr. Smith was that he could not remember where his children went to school. Indeed, the record reflects that upon being asked by defense counsel where his children went to school, Mr. Smith replied that he had forgotten the names of the schools they went to. As the prosecutor explained, the instant case “is about relationships with your children ... when we have got mothers testifying about their children, we have children dead. This is a case that is going to turn, I believe, on your relationships.” A juror’s forgetting where his children went to school “indicates a lack of relationship as a father to the children” and renders him unsuitable for the state’s perspective for reasons entirely unrelated to race.
 

 That Mr. Smith’s answer was not given in response to questioning by the state is immaterial. First, the state engaged in
 
 *1067
 
 questioning regarding the number |48and ages of children each venire person had during the first jury panel. Consequently, it cannot be said that prosecutors failed to engage in any meaningful examination on the subject of venire persons and their children. Second, the number of children of each venire person was indicated on the venire sheet, making such questioning irrelevant unless some reason existed for prosecutors to suspect that the numbers provided were fraudulent. Finally, as noted by the prosecutor in chambers, Mr. Smith’s lack of knowledge concerning where his children went to school did not become an issue until inadvertently raised by defense counsel, who it is reasonable to presume did not himself expect Mr. Smith’s answer to be that he did not know. The state had no opportunity for rebuttal voir dire in order to develop Mr. Smith’s response.
 

 While
 
 Miller-El
 
 admonishes against “the State’s failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about,” 545 U.S. at 246, 125 S.Ct. 2317, the court’s concern cannot reasonably apply to a specific issue — the knowledge of where one’s children went to school — that prosecutors had no rational cause to call into question until the defense’s questioning of Mr. Smith. Certainly, the state is not precluded from basing a decision to strike on responses elicited by defense counsel if those responses give prosecutors a legitimate, race-neutral cause to question the particular juror’s ability to be a favorable juror.
 

 Based on “[t]he whole of the voir dire testimony,” in light of the legitimate issues involved in the case, the evidence as to Mr. Smith does not support the conclusion that “race was significant in determining who was challenged and who was not.”
 
 Miller-El,
 
 545 U.S. at 252, 125 S.Ct. 2317. The defendant has not shown that the trial court abused its discretion in accepting the state’s race-neutral reasons for striking Mr. Smith. The
 
 Batson
 
 claim fails,
 

 j
 
 wDonyell Bickham
 

 The defendant claims that prosecutors’ proffered reasons for striking Ms. Bickham — her lack of interest in becoming a police officer and her stated refusal to stand up for a fellow juror who expressed a view of the defendant’s guilt different from hers — were pretexts for discrimination.
 
 [13]
 

 The state’s proffered reasons were race-neutral and related both to Ms. Bickham’s view of the NOPD and her' ability to fairly consider the evidence during deliberations. The prosecution asked the venire whether they, as prospective jurors, could keep an open mind when listening to police testimony despite positive or negative previous experiences with law enforcement. Ms. Bickham did not volunteer any information. Defense counsel similarly asked the panel if any members of the venire knew anyone in law enforcement and whether that would affect their ability to impartially consider police testimony at trial, to
 
 *1068
 
 which Ms. Bickham acknowledged that her uncle was a member of NOPD and that she had received, but never filled out, a NOPD application. This was the state’s first indication, despite similar questioning, that Ms. Bickham had a pre-existing relationship with a member of NOPD and that he had unsuccessfully attempted to hnrecruit her to the force. Prosecutors did not have the opportunity of further rebuttal questioning of Ms. Bickham or any other jurors on the issue.
 

 When the state asks a question going to the heart of its reason for striking a potential juror — whether she can impartially consider police testimony — and receives no initial response, it is unreasonable to punish prosecutors in hindsight for failing to “follow up” on that non-response. The prosecution could legitimately rely on what they learned based on answers to the same question as put to the prospective juror by the defense in deciding to strike the juror.
 

 While their reservations would not have sustained a challenge for cause, prosecutors could legitimately be concerned that Ms. Bickham’s reluctance to join the police force, despite her uncle being a member and urging her to join, indicated reservations on her part about that particular force. The mere fact that a potential juror may be acceptable to the defense does not mean that he or she is unfavorable to the state. In any event, regardless of her appeal to the defense, Ms. Bickham’s ultimate reluctance to join the NOPD was sufficient for prosecutors to question her impartiality as to NOPD witnesses and to strike her for that reason as a function of trial strategy.
 

 The state’s second proffered reason for striking Ms. Bickham was related to her indication to defense counsel that, if she were foreperson and believed the defendant to be guilty, she would not stand up for a fellow juror who reasonably felt he was not guilty. The prosecutor explained that she understood that as “basically a failure to listen to and be convinced by other jurors.” The defendant’s assertion that the state “never posed the question in the opposite way” is nonsensical, as the state neither posed the question initially nor had the benefit of rebuttal voir dire in order to expand the topic. Likewise, the defendant’s claim, | B1 that prosecutors “showed a complete lack of interest in the topic until it came time to explain its peremptory strikes,” fails to contemplate some moment between the questions being asked by defense counsel and the state’s announcing of its peremptory strikes in which prosecutors could demonstrate their interest in the subject of the question.
 

 To the extent that the defendant contends that prosecutors never showed any interest in the topic of Ms. Bickham’s ability to listen and be convinced by other jurors during deliberation, he is mistaken. Wfiiile the phrasing and specificity of the questioning may have differed from that of defense counsel, the prosecutors sought to obtain the same essential confirmation from the venire — whether they could rationally consider the evidence in light of the state’s burden of proof. To that end, the state questioned Ms. Bickham personally about the limits of reasonableness when considering any doubts as to the state’s evidence.
 

 Moreover, the defendant’s assertion that prosecutors “acknowledged that the claim was suspect because [Ms. Bickham’s] answer ‘seemed favorable to the State’ ” takes the prosecutor’s statement out of context. Her precise admission was: “While it was phrased by the defense in a way that seemed favorable to the State, I had a problem with' [Ms. Bickham’s response].” Thus, the prosecutor explained that, defense counsel’s seemingly favorable phraseology aside, Ms. Bickham’s answer
 
 *1069
 
 gave her pause as to her ability to rationally consider the evidence. A potential juror’s admitted inflexibility in the light of reasonable interpretations of the evidence is a valid, race-neutral ground for exercising a peremptory challenge. To the extent that the trial court found a
 
 prima facie
 
 case of discrimination as to Ms. Bickham— which the record does not support — it acted within its discretion |S2in finding that the state’s race-neutral reasons for excusing her were supported by the record.
 

 Dudley Grady
 

 Next, the defendant challenges the state’s use of a peremptory strike to remove Mr. Grady from the venire, arguing that its disproportionate questioning of him in relation to other jurors evidenced the prosecutors’ discriminatory intent. The record, contrary to the defendant’s assertion, does not bear out this allegation. In fact, the record evidences that Mr. Grady’s continued inability and/or unwillingness to grasp or follow the law of principals or the state’s burden of proof made him the legitimate target of further questioning as well as a strike for cause by the state.
 

 In chambers after the examination of the first panel, the state moved to excuse Mr. Grady for cause, citing his specific statement that he could not convict on testimony alone notwithstanding instructions from the court to the contrary. Prosecutors also cited his lack of understanding of the law of principals (see La. R.S. 14:24), which was integral to the state’s case. Upon further questioning in chambers, Mr. Grady confirmed that testimonial evidence alone would be insufficient for him to convict, he would need corroborating physical evidence to find that the state had met its burden. Even defense counsel’s initial attempts to rehabilitate him failed to gain his assurance that he could follow the law regardless of how much he believed a particular witness. Because Mr. Grady ultimately conceded that he could follow the court’s instructions to weigh the credibility of each witness’ testimony and that the testimony of a single witness would be sufficient to convict, the trial court denied the state’s challenge for cause. The 153prosecutors, however, were more than reasonable in finding his protracted and belabored concession that he could follow the law to be of dubious value.
 
 See Uttecht v. Brown, supra.
 

 Furthermore, the record reveals that the state’s extended questioning of Mr. Grady was warranted. The defendant argues that prosecutors continued examining him even though he said that he could follow the law. We find this inaccurate, however. For example, after explaining the felony murder doctrine, the first three jurors polled stated that they agreed with it. When the prosecutor asked Mr. Grady, he responded that he agreed with it “somewhat, but not all the way,” based on his “reasons.” The prosecutor asked him what his reasons were, to which he explained that he did not agree that a defendant who participated in the commission of a felony during which the victim is accidentally killed by his co-perpetrator should be held to the same standard of culpability for the killing. As his belief was in direct contravention of Louisiana law, counsel for the state properly continued to examine him. After what appears in the transcript as more than a page of questioning, Mr. Grady still refused to assure the prosecution that he could follow the felony murder doctrine. Therefore, Mr. Grady never said that he could follow the law; the prosecution’s continued questioning of him was warranted.
 

 The defendant’s claim that the state’s discriminatory intent was evidenced by its asking Mr. Grady what more he would require beyond testimony in order to con
 
 *1070
 
 vict, despite not previously having asked a Caucasian juror the same question, is mer-itless. The prosecutor asked Mr. Houston, a Caucasian juror, whether he could convict on testimony alone, to which he responded that he could, although he would probably need more than one witness. Mr. Grady, on the other hand, stated ^affirmatively, “No, not on just testimony only.” This significant difference between the answers given by the two venire persons fully supported the prosecution’s decision to further press Mr. Grady on the issue, which resulted in his conclusion that he would require DNA as well as testimony in order to convict.
 

 Based on the totality of his answers to that point, the state was likewise reasonable in asking Mr. Grady at the end of its voir dire whether he would require the state to prove its case beyond all doubt, a question that was also put to Jacqueline Gamble, a Caucasian juror. Thus, despite the defendant’s contention to the contrary, the prosecutors’ more intensive examination of Mr. Grady was not due to his race or an attempt to generate grounds for a peremptory challenge.
 

 Finally, as proffered by the state, Mr. Grady stated his belief that police officers would plant evidence if they had a reason to. Taken as a whole, the record provides numerous legitimate, race-neutral reasons supporting Mr. Grady’s peremptory challenge. Based on “[t]he whole of the voir dire testimony,” in light of the legitimate issues involved in the case, the evidence as to Mr. Grady does not support the conclusion that “race was significant in determining who was challenged and who was not.”
 
 Miller-El,
 
 545 U.S. at 252, 125 S.Ct. 2317. The defendant has not shown that the trial court abused its discretion in accepting the state’s race-neutral reasons for striking him and the defendant’s
 
 Batson
 
 claim is meritless.
 

 Laham Knight
 

 The defendant next asserts that the state’s proffered reason for striking Mr. Knight — that he had serious reservation about finding a defendant guilty of a crime that carried a mandatory life sentence — was a pretext for racial | ¿-discrimination and was further rendered incredible because a Caucasian juror who was not struck gave a similar answer. We find the defendant’s claim meritless.
 

 As with Mr. Grady, prosecutors moved to challenge Mr. Knight for cause due to his life sentence reservations; the record reflects that Mr. Knight consistently and unwaveringly, even in chambers after voir dire, reaffirmed that the sentencing possibilities upon conviction would influence his decision as to the defendant’s guilt because putting someone in jail for the rest of his life would cause him problems. In the end, counsel were able to elicit a grudging acknowledgement that Mr. Knight would follow the law because “you don’t have a choice to follow it or not, but it — you know.” Thus, even his ultimate admission was qualified by his trailing ending, indicating that his affirmation that he could follow the law was not his final thought on the matter.
 

 We agree that Mr. Knight’s admission was sufficient for the trial court to deny the state’s cause challenge. However, his continuing reservations about convicting someone of a crime which carried a mandatory life sentence provided sufficient, legitimate, race-neutral grounds based upon which the state could exercise a peremptory strike against him due to doubt that his admission was truthful. Moreover, Mr. Knight’s reservations about mandatory life sentencing distinguish him from William Kuhs (“Mr. Kuhs”), a Caucasian juror, whom the defendant argues was not struck by the state despite giving a similar answer. When asked whether he could fol
 
 *1071
 
 low the law and convict based solely on the evidence, Mr. Kuhs stated much more definitively, “I think I can do that.” Contrary to the defendant’s assertion, Mr. Kuhs’ answer indicated that he did not share with Mr. Knight similar views on his in ability to follow the law. The defendant’s emphasis on the word “think” does not suffice to call Mr. Kuhs’ ability |5(ito follow the law into question, quite unlike Mr. Knight’s lengthy explanation of his discomfort with mandatory life sentences, as well as his reasons therefor. Mr. Knight explained that his brother served over forty years of a life sentence, that formed the basis of his opinion on the subject. This fact provided a distinction between Mr. Knight and Mr. Kuhs that reasonably caused prosecutors to further doubt the former’s begrudging statement that he could follow the law; nothing similar existed to call Mr. Kuhs’ already more convincing admission into question. Their expressed views on the relevant subject were dissimilar and formed a proper basis for differential treatment in the exercising of peremptory strikes.
 

 Prosecutors validly struck Mr. Knight due to their well-founded uncertainty over whether he could follow the law and vote to convict the defendant in spite of the fact that he would be sentenced to a mandatory life sentence. Also of concern was his statement that police officers plant evidence in order to frame people. Therefore, based on “[t]he whole of the voir dire testimony,” in light of the legitimate issues involved in the case, the evidence as to Mr. Knight does not support the conclusion that “race was significant in determining who was challenged and who was not.”
 
 Miller-El,
 
 545 U.S. at 252, 125 S.Ct. 2317. This
 
 Batson
 
 claim fails.
 

 Ethelyn Webb
 

 The defendant claims that the record surrounding the state’s striking of Ms. Webb is incomplete, but that its inadequacy does not preclude a finding that the state excused her because of her race. While the defendant provides no legal or factual support for this contention, his claim is nonetheless meritless. In challenging Ms. Webb for cause, prosecutors stated that she had indicated that she could not convict based on testimony alone and thus could not follow the law. |S7While the cause challenge was ultimately denied, the record supports the state’s proffered reasons; when asked by the prosecutor during voir dire whether she could convict on the believed testimony of a single witness, Mr. Webb responded, “I need more evidence.” Despite the fact that the trial court ultimately denied the prosecution’s challenge for cause, her statement — even if rehabilitated — was sufficient to give them pause to question her ability to follow the law and, thus, provided a legitimate, race-neutral reason to exercise a peremptory challenge against her. The defendant does not meet his burden of showing that the trial court abused its discretion in agreeing with the state’s race-neutral reasons for striking her. This
 
 Batson
 
 challenge has no merit.
 

 Cumulative Error
 

 By these assignments of error, Terry argues that the cumulative evidence of the state’s race-based exercise of peremptory strikes combine to prove that the trial court abused its discretion in overruling his
 
 Batson
 
 objections.
 

 The defendant does not demonstrate a cumulative
 
 Batson
 
 violation by the mere aggregation of his individually meritless claims. A review of the defendant’s
 
 Bat-son
 
 claims failed to uncover any reversible error. The combined effect of assignments of error, none of which warrants reversal on its own, does not deprive a defendant of his right to a constitutionally
 
 *1072
 
 fair trial.
 
 State v. Copeland,
 
 530 So.2d 526, 544-45 (La.1988). The Supreme Court has noted that the “cumulative error” doctrine has lost favor in the Louisiana courts.
 
 State v. Draughn,
 
 05-1825, p. 70 (La.1/17/07), 950 So.2d 583, 629. Significantly, the Supreme Court in
 
 State v. Manning,
 
 03-1982 (La.10/19/04), 885 So.2d 1044,
 
 quoted with approval in Mullen v. Blackburn,
 
 808 F.2d 1143, 1147 (5th Cir.1987), where the federal court 1 .^rejected the cumulative error doctrine by noting that “twenty times zero equals zero.” Consequently, this assignment of error is without merit.
 

 Credibility Determination
 

 The defendant’s next claim accuses the trial court of failing to conduct the third prong of the
 
 Batson
 
 analysis,
 
 ie.,
 
 weighing the credibility of the state’s race-neutral reasons for its peremptory strikes upon a finding that the state’s proffered reasons for exercising its strikes were race-neutral on their face. The defendant argues that the trial court merely rubber-stamped its acceptance of the state’s explanations, thus denying the trial court’s factual findings deference under
 
 Batson.
 
 In support of this argument, the defendant cites
 
 State v. Collier,
 
 553 So.2d 815 (La.1989).
 

 In
 
 Collier,
 
 the Court found that the judge erred when he “did not reach the point of assessing the weight and credibility of the explanations, but merely accepted the explanations because they were racially neutral on their face.”
 
 Id.
 
 at 821. The court emphasized that:
 

 [A judge] cannot merely accept the reasons proffered at face value, but must evaluate those reasons as he or she would weigh any disputed fact. In order to permit the questioned challenge, the trial judge must conclude that the proffered reasons are, first, neutral and reasonable and, second, not a pretext. These two requirements are necessary to demonstrate ‘clear and reasonably specific ... legitimate reasons.’
 
 Batson,
 
 476 U.S. at 89 n. 20, 106 S.Ct. at 1724 n. 20. Moreover, they serve the goal of demonstrating a ‘neutral explanation related to the particular case to be tried,’
 
 id.
 
 at 89, 106 S.Ct at 1723, and that ‘the questioned challenges were not exercised solely because of the prospective jurors’ race.’
 

 Id.
 
 at 822, quoting
 
 State v. Slappy,
 
 522 So.2d 18, 22 (Fla.1988).
 

 |
 
 X)Coilier
 
 also noted that “a reviewing court should generally accord the trial court great discretion in its determination of where there was purposeful discrimination in the prosecutor’s exercise of peremptory challenges.”
 
 Id.
 
 at 822.
 
 Collier
 
 does not require that the trial judge make a separate initial finding that the state’s proffered reasons for exercising a strike are facially race-neutral before ruling on their credibility. In fact, as noted by the Unites States Supreme Court, “[u]nless a discriminatory intent is inherent in the prosecutor’s explanation, the reason offered will be deemed race-neutral.”
 
 Purkett,
 
 514 U.S. at 768, 115 S.Ct. 1769. Thus, it is unnecessary for the trial judge to separately pronounce that the state’s proffered reason is facially neutral; the lack of any inherent discriminatory intent deems it so.
 
 See Elie,
 
 936 So.2d at 795 (“If the race-neutral explanation is tendered, the trial court must decide, in step three of the
 
 Batson
 
 analysis, whether the defendant has proven purposeful discrimination.”).
 

 Even if a reviewing court were to find that the trial court improperly conflated the second and third
 
 Batson
 
 steps, such an erroneous ruling does not lose all entitlement to deference or require reversal. The
 
 Collier
 
 court considered remand to the trial court for a “hearing on the issue and for application of the correct stan
 
 *1073
 
 dard,” and ultimately it chose to consider the issue on its merits
 
 sua sponte. Id.
 
 at 823. The trial judge in
 
 Collier,
 
 upon finding a
 
 prima facie
 
 case of discriminatory strikes, received the prosecutors’ race neutral reasons as to each challenged juror and announced on the record his understanding that “the D.A. gives his reasons. So long as they are not based on race, I have to find that they are satisfactory.”
 
 Id.
 
 at 821 n. 9. Thus, the judge evidenced his misunderstanding of
 
 Batson’s
 
 requirements.
 

 IsnThe trial court in the case before us displayed no misunderstanding. While the defendant provides no factual support from the record for his paragraph-long claim, it is without merit.
 

 For the sake of brevity, we decline to discuss Messrs. Grady, Knight, Walker, Smith, and Mses. Johnson and Chaney again. We note that in each instance, the trial court ruled that it was “satisfied” with the race-neutral basis given by the state for excusing these venire persons.
 
 [14]
 

 Based on the totality of the evidence presented to the trial court and contained in the record of the voir dire proceedings — all of which the court was required to consider — its factual conclusion that the state had met its burden of providing satisfactorily race-neutral, nonpretextual reasons for striking each of the complained-of jurors sufficed to fulfill its duty on the third step of
 
 Batson. Collier
 
 is factually distinguishable, and the defendant’s assignment of error is without merit.
 

 Second Pattern of Discrimination
 

 The defendant’s final
 
 Batson
 
 assignment is that the trial court failed, following the end of voir dire, to find a second
 
 prima facie
 
 pattern of discriminatory strikes by the state. He claims that the bare statistics plainly require a
 
 prima facie
 
 finding and, further, that the presence of African-Americans on the In, trial jury does not negate such a finding. Finally, the defendant urges this court to consider the “context in which this trial was conducted.”
 

 While the defendant correctly quotes
 
 Purkett, supra,
 
 for the proposition that once a
 
 prima facie
 
 case of discrimination has been made, the burden shifts to the proponent of the strike to provide a race-neutral explanations therefor
 
 (see
 
 514 U.S. at 767, 115 S.Ct. 1769), the defendant presents no legal support for his argument that the
 
 prima facie
 
 presumption remains in effect even after the court has accepted the proponent’s race-neutral reasons. The plain reading of the
 
 Batson
 
 factors leads to the opposite conclusion: once the court has satisfied itself that the state did not discriminate in the exercise of its peremptory strikes, the inquiry is closed. In such a case, where the initial disparate pattern of strikes has been shown to be unrelated to any intent on the part of the prosecutor, the defendant is required to make a second
 
 prima facie
 
 analysis as to any subsequent strikes.
 
 [15]
 

 
 *1074
 
 At the time the defense’s second
 
 Batson
 
 objection was made, all four venire panels had been examined; the full jury consisted of eight African-Americans and four Caucasians.
 
 [16]
 
 The state exercised seventeen of its twenty-four total peremptory strikes and had seven remaining unused. The court found no
 
 prima facie
 
 pattern of discrimination and did not force the state to give its reasons for striking seven American-American jurors with its eight third-panel strikes.
 
 [17]
 
 The | ^defendant points to statistics alone as sufficient proof that the trial court erred in refusing to find a second
 
 prima facie
 
 pattern.
 

 The
 
 Batson
 
 court “placed considerable trust in the perceptive ability and fair-minded attitude of trial judges.”
 
 Collier,
 
 553 So.2d at 818. As such, a trial court’s factual findings are “entitled to great deference by a reviewing court.”
 
 Id.
 
 As noted above, to make out a
 
 prima facie
 
 case of a discriminatory pattern of strikes “a defendant must prove discrimination by more than the sole fact that the minority venire person was struck by peremptory challenge.”
 
 United States v. Branch,
 
 989 F.2d at 755. In so doing, a defendant may offer to the trial court:
 

 ... any facts relevant to the question of the prosecutor’s discriminatory intent to satisfy this burden. Such facts include, but are not limited to, a pattern of strikes by a prosecutor against members of a suspect class, statements or actions of the prosecutor which support an inference that the exercise of peremptory strikes was motivated by impermissible considerations, the composition of the venire and of the jury finally empaneled, and any other disparate impact upon the suspect class which is alleged to be the victim of purposeful discrimination.
 

 Green,
 
 655 So.2d at 288.
 

 In support of his
 
 prima facie
 
 case of discriminatory pattern, the defendant offers nothing more than the prosecution’s pattern of strikes. While the undeniable that prosecutors exercised fifteen of their seventeen strikes against African-Americans, including seven of its eight on the third panel, that alone is insufficient to “raise an inference that the prosecutor used that practice to exclude the venire persons from the petit jury on account of their race.”
 
 Batson,
 
 476 U.S. at 97, 106 S.Ct. 1712. He points to no statements or actions of the prosecutors that legitimately support an inference that the use of the state’s peremptory strikes was motivated by race. The composition of the venire, of which African-Americans made up more than half its | ^number, does not provide any support either. Nor can the defendant look to the composition of the final jury as indicative of prosecutors’ racist intentions. Finally, the defendant has alleged no disparate impact upon African-Americans aside from the exclusion of some of them from the jury as evidence of the invidious use of peremptory challenges.
 

 The defendant argues that the composition of the final jury venire does not by itself defeat a
 
 Batson
 
 violation.
 
 *1075
 
 This is true. However, in cases where
 
 Batson
 
 violations have been sustained, the composition of the final jury panel was not only relevant to the reviewing count’s analysis, but was markedly different from the jury in the instant case. In
 
 Collier,
 
 the African-American defendant’s trial jury consisted of ten Caucasians and two African-Americans. The Court found this ratio especially troubling in light of the jury’s 10-2 guilty verdict:
 

 Because only ten votes were needed to convict defendant ... the prosecutor could have assumed, contrary to
 
 Bat-son’s
 
 admonition that it was unacceptable to do so, that all black jurors would vote on the basis of racial bias and then purposefully discriminated by limiting the number of blacks on the jury to two.
 
 [18]
 

 Collier,
 
 553 So.2d at 819-20.
 
 [19]
 

 | (¡.(The Louisiana Supreme Court has reached the same conclusion. In
 
 State v. Thompson,
 
 516 So.2d 349 (La.1987), the prosecution exercised all eight of its peremptory challenges against African-American venire persons, although it accepted seven. After cuts for cause, the trial jury contained seven Caucasian jurors and four African-American jurors when the defendant moved for a mistrial due to the state’s pattern of strikes against African-Americans.
 
 [20]
 
 The trial court denied an eviden-tiary hearing on the issue and, upon conviction, the Supreme Court found that
 
 Thompson
 
 had failed to establish a
 
 prima facie
 
 case of discrimination. Specifically, the Court noted the state’s acceptance of seven African-American jurors and the lack of any suggestion of discriminatory intent in the prosecutor’s questioning of venire persons. Thus, the defendant’s final assertion that this court must consider the trial court’s ruling in light of the evidence that was adduced in the subsequent trial due to the “salience of race in this case” has no basis in law or reason.
 

 The defendant has failed to demonstrate the existence of “exceptional circumstances” required for an appellate court to impinge upon the “great deference” placed in the hands of the trial courts in considering
 
 Batson
 
 claims.
 
 Snyder,
 
 552 U.S. at 477, 128 S.Ct. 1203. In disputing the trial court’s factual conclusions, the defendant
 
 *1076
 
 has further failed to present sufficient evidence for this court to be “left with the definite and firm conviction that a mistake has been committed.”
 
 Bentley-Smith,
 
 2 F.3d at 1377,
 
 supra.
 

 The defendant’s
 
 Batson
 
 claims are without merit.
 

 |
 
 ^TERRY’S ASSIGNMENT OF ERROR NUMBER 4
 

 THATCHER’S ASSIGNMENT OF ERROR NUMBER 5
 

 In identical assignments, the defendants argue the trial court erred by denying their request for mistrial. Specifically, the defendants claim prejudicial error resulting from Ms. McElveen’s testimony that defense counsel told her she would not have to testify at trial if the defendants accepted a plea offer. The defendants argue that the objectionable testimony was “tantamount to a confession of guilt to most jurors” because the jury would conclude that the defendants would only consider pleading guilty if they were in fact guilty. The jury’s speculation on the testimony is the basis of the defendants’ objection, which they claim “fatally infect[s] [their] presumption of innocence.” The defendants cite La. C.E. art. 410 as additional support for a mistrial.
 

 A mistrial is mandatory when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial. However, a mistrial is a drastic remedy that should only be declared upon a clear showing of prejudice by the defendant.
 
 State v. Leonard,
 
 05-1382, p. 11 (La.6/16/06), 932 So.2d 660, 667. The mere possibility of prejudice is insufficient to warrant a mistrial.
 
 Id.
 
 “The determination of whether actual prejudice has occurred, and thus whether a mistrial is warranted, lies within the sound discretion of the trial judge, and this decision will not be overturned on appeal absent an abuse of that discretion.”
 
 State v. Wessinger,
 
 98-1234, p. 24 (La.5/28/99), 736 So.2d 162, 183.
 

 The defendants’ reliance on La. C.E. art. 410 is misplaced as that provision prohibits the admission of evidence relating to a completed guilty plea or | ^incriminating statements made during unsuccessful plea negotiations.
 
 [21]
 
 Neither of those instances occurred in this case.
 

 The defendants concede that no case law on point exists; however, they suggest that this court look to
 
 State v. Gaspard,
 
 301 So.2d 344 (La.1974) and
 
 State v. Joyner,
 
 228 La. 927, 84 So.2d 462 (1955) for guidance in its consideration of the effect of Ms. McElveen’s statement. We find neither of those cases lends support for the defendants’ claim of prejudice against their presumption of innocence.
 

 In
 
 Gaspard,
 
 the defendant was charged with, and convicted of, the attempted murder of his wife. During cross examination the prosecutor asked the defendant if it
 
 *1077
 
 was not a fact that he had been charged with attempted murder in another incident. The Court found reversible error concluding that references to arrests and indictments cannot be used even for the purpose of impeachment. Unlike the case before us,
 
 Gaspard
 
 involved a non-testimonial statement by the prosecutor about what the defendant “wanted to plead to” made in the course of objecting to a question by defense counsel.
 

 |fi7In
 
 Joyner,
 
 the defendant pleaded guilty to automobile theft, but withdrew the plea before trial, when he was charged as a multiple offender. On appeal, the defendant argued that he was improperly convicted because the trial judge, over his objection, permitted the introduction of the court minutes reflecting the guilty plea and its withdrawal. The Court found prejudicial error and reversed the conviction. However,
 
 Joyner
 
 involved evidence of a guilty plea actually entered into by the defendant, unlike Terry and Thatcher.
 

 The state also notes that no cases directly on point exist, but submits
 
 State v. Divers,
 
 38,524 (La.App. 2 Cir. 11/23/04), 889 So.2d 335,
 
 writ denied,
 
 04-3186 (La.4/8/05), 899 So.2d 2, as a case for this court’s consideration. In
 
 Divers,
 
 the defendant was convicted of two counts of second-degree murder. At trial, a witness testified that while he was jailed with the defendant, the defendant told him that the district attorney had offered the defendant a plea bargain. The court found no prejudicial error, opining that because the testimony about the former plea negotiation did not in itself tend to show the defendant’s guilt, the trial court did not commit reversible error in allowing its introduction.
 

 In the case at bar, no evidence exists regarding any statements the defendants may have made in the course of plea negotiations with the state, or that any such negotiations had occurred. Neither was there a suggestion that a plea deal had been offered by the district attorney’s office or that the defendants ever considered a plea. Although the defendants contend that Ms. McElveen’s comment prejudiced them because it implied their guilt, the comment was likely equally prejudicial to the state. The jury could have speculated that the district attorney sought a plea deal because the prosecution lacked confidence in its case against the defendants.
 

 | fisEven assuming error was committed in the trial court’s refusal to grant a mistrial, any such error was harmless.
 

 In
 
 Sullivan v. Louisiana,
 
 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993), the Court stated that the test for harmless error “is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error.”
 

 The evidence in the case before us is clearly condemning. The white T-shirt containing Mr. Lorino’s blood found in the McElveen residence after the murder provided strong evidence of Terry’s involvement in Mr. Lorino’s death. The aggregated testimony of Ms. McElveen, Ms. Smith, and Mr. Hernandez establish that two young, black males fitting the defendants’ physical and clothing descriptions left the McElveen residence before the murder saying they’d kill for cigarettes, attacked the victim in his apartment, fled through the kitchen door, jumped a fence heading back toward the McElveen residence after the murder, where they threatened to kill their mother if she called the police. Moreover, the jury heard Major Little testify that the defendants discussed who would “take” the murder charge following their arrest. The combined weight of the evidence proves the defendants
 
 *1078
 
 guilty of the murder of Mr. Lorino. The verdict in this case was not attributable to any potential error in the denial of the motion for mistrial. These assignments have no merit.
 

 TERRY’S ASSIGNMENT OF ERROR NUMBER 5
 

 THATCHER’S ASSIGNMENT OF ERROR NUMBER 7
 

 In these assignments, the defendants complain that their Sixth Amendment right to confront Mr. Tafaro was imper-missibly violated by the trial court’s | ^exclusion of evidence demonstrating Mr. Tafaro’s “racist tendencies and mental defects.”
 

 This issue is also addressed in Terry’s first assignment of error and will not be revisited. Suffice it to say, the trial court was well within its discretion in finding that the proffered evidence neither suggested that Mr. Tafaro held racist views toward African-Americans nor suffered from any mental defects, and that the evidence’s impeachment value was nil.
 

 In another argument under this assignment, the defendants contend that the trial court erred by prohibiting defense counsel from impeaching Mr. Tafaro with prior inconsistent statements. The defendants focus on Mr. Tafaro’s testimony in the case of
 
 State v. Ricky Coston
 
 — that in his position he has the opportunity to manipulate evidence — was inconsistent with his testimony in this case that he never considered altering evidence.
 

 At the outset, it should be noted that despite the state’s sustained objections as to relevance, defense counsel continued to ask Mr. Tafaro about his
 
 Coston
 
 testimony, reading verbatim his statement in the presence of the jury each time. Thus, the jury did hear Mr. Tafaro’s testimony from the
 
 Coston
 
 case. We find the defendants’ argument is not viable. Mr. Tafaro’s prior statement — that he can tamper with evidence due to his position — does not conflict with his testimony in this case that he never considered doing so. One statement speaks to Mr. Tafaro’s potential for malfeasance, while the other to the lack of his actual commission of such. The statements are unrelated. Moreover, in his
 
 Coston
 
 testimony, Mr. Tafaro said the decision to actually tamper with evidence comes down to an individual’s integrity. The defendants offered no evidence at trial attacking Mr. |70Tafaro’s integrity in handling evidence or that he was ever accused of or disciplined for mishandling evidence.
 

 The defendants have failed to meet their burden of demonstrating that their right to confront and effectively cross examine Mr. Tafaro was prejudiced by the exclusion Mr. Tafaro’s
 
 Coston
 
 testimony.
 

 In one of two remaining arguments under this assignment, Terry maintains that his Sixth Amendment rights were violated by the trial court’s refusal to allow his counsel to cross examine Detective Hoobler about his prior disciplinary suspension for filing false and inaccurate reports. The defendant claims counsel should have been allowed to explore the facts surrounding the prior incident because Detective Hoobler did not “distinctly admit” the fact of his prior discipline.
 

 On direct examination by the state, Detective Hoobler admitted that he had been disciplined in 2000 for having filed a false police report in connection with the listing on an evidence card of the location where certain evidence had been seized. He explained the procedure he undertook in relation to the evidence in question and how it diverged from departmental procedure. Although he stated that he had not felt at the time of his action that what he was doing was improper, he confirmed that he was suspended for three days for filing the
 
 *1079
 
 false report based on his filling out the evidence card. He did not deny the fact of his suspension or the reasons therefor.
 

 Defense counsel then engaged Detective Hoobler in cross examination about the facts surrounding his suspension, including the discrepancy between the police report and the evidence tag in question. When defense counsel questioned Detective Hoo-bler’s knowledge of proper police procedure, the state objected, |71noting that the detective had admitted the prior disciplinary action, and the parties approached the bench. Defense counsel argued that Detective Hoobler had not truly admitted to any wrongdoing, to which the prosecutor responded that he had admitted to violating departmental rules. The trial court found that Detective Hoobler had indeed acknowledged the violation and suspension, sustained the state’s objection to defense counsel’s attempt to elicit additional facts surrounding the violation.
 

 La. C.E. art. 613 provides:
 

 Except as the interests of justice otherwise require, extrinsic evidence of bias, interest, or corruption, prior inconsistent statements, conviction of crime, or defects of capacity is admissible after the proponent has first fairly directed the witness’ attention to the statement, act, or matter alleged, and the witness has been given the opportunity to admit the fact and has failed distinctly to do so. [Emphasis supplied.]
 

 The record in this case evidences that Detective Hoobler distinctly admitted both on direct and cross examination that he had been disciplined and suspended by the NOPD for filing a false police report. That is the “act” or “matter” alleged. Detective Hoobler’s statement that he did not believe at the time that what he was doing was wrong does not render his admission that he had indeed violated departmental rules any less distinct. He did not exhibit any disagreement with the department’s decision or continued belief in the correctness of his actions. His explanation of the facts surrounding the suspension on direct examination reasonably demonstrated his acknowledgement that he was wrong.
 

 The ruling of the trial court as to the scope and extent of cross examination should not be disturbed absent an abuse of the court’s broad discretion.
 
 State v. Irish,
 
 00-2086, p. 7 (La.1/15/02), 807 So.2d 208, 213. In any event, confrontation errors are subject to a harmless error analysis.
 
 State v. Burbank,
 
 02-1407, p. 3 (La.4/23/04), 872 So.2d 1049, 1051,
 
 citing Delaware v. Van Arsdall,
 
 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).
 

 The jury heard the facts surrounding Detective Hoobler’s suspension for filing a false police report and he testified that he did not participate in the collection or logging of evidence in the case before us. The evidentiary weight of the impeachment information was therefore minimal. The defendants have not demonstrated that any purported error on the part of the trial court contributed to the jury’s verdict.
 

 The final issue under this assignment concerns the trial court’s prohibiting defense counsel’s use of Officer Cuadrado’s crime scene report to refresh Detective Matthews’ memory as to whether Detective Matthews sent blood samples from the crime scene to Mr. Tafaro for serology testing. This, the defendant argues, impeded him in establishing that Mr. Tafaro had custody of Mr. Lorino’s blood in the serology lab, which presumably would have bolstered the defense theory that Mr. Tafaro planted the victim’s blood on the shirt found in the McElveen residence.
 

 Initially, the basis of the state’s objection to use of the report to refresh Detective Matthews’ recollection from a report authored by another person was legally
 
 *1080
 
 insufficient to prohibit a party from doing so. The trial court erroneously sustained the prosecution’s objection on that ground. La. C.E. art. 612(B);
 
 [22]
 

 State v. Lewis,
 
 288 So.2d 348 (La.1974). However, we find any error by the trial court 17Swas harmless.
 
 See Chapman v. California,
 
 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (holding that constitutional error is harmless if the beneficiary shows beyond a reasonable doubt that there is not “a reasonable possibility that the evidence complained of might have contributed to the conviction.”).
 

 In this case, Detective Matthews acknowledged that he did request the testing of some physical evidence from the scene. Moreover, Officer Cuadrado testified that he collected the bloody T-shirt from the McElveen residence and logged it into Central Evidence and Property; Officer Cuadrado was also cross examined on his crime scene report. Finally, Mr. Tafaro testified as to the numerous items he received in the Crime Lab from Central Evidence and Property for testing, including an FTA card containing a sample of Mr. Lorino’s blood and the bloody white T-shirt from the McElveen residence. The fact that the victim’s blood was in Mr. Tafaro’s possession in the serology lab had been established by the time Detective Matthews testified. Any further inquiry through him would have been merely repetitive. Moreover, the defendant does not suggest how the establishment of the fact that Detective Matthews requested serology testing on items found at the crime scene would have bolstered the defense’s theory that the bloody T-shirt was a fabrication. The defendant has failed to show how the | ^prohibition of his ability to refresh Detective Matthews’ recollection contributed to the verdict.
 

 These assignments are without merit.
 

 TERRY’S ASSIGNMENT OF ERROR NUMBER 6
 

 THATCHER’S ASSIGNMENT OF ERROR NUMBER 6
 

 In their sixth assignments, the defendants argue four errors in the trial court’s allowing the prosecution to introduce the testimony of Major Little, who testified that he videotaped and listened in on a conversation between the defendants in which they discussed who would “take” the charge for murdering Mr. Lorino.
 

 Following a pre-trial hearing regarding the tape recording of the entire forty minute conversation between the defendants, the trial court ruled that the portions in which the defendants discuss who was going to “take” the murder charge were admissible, but ruled inadmissible the remaining portions of the tape in which the defendants discussed prior crimes and convictions, as well as potential sentences as multiple offenders. The trial court ordered the state to redact the tape record
 
 *1081
 
 ing to excise inadmissible portions (evidence of other crimes). However, prior to Major Little’s testimony, the state informed the court that it was unable to redact the audiotape, because of the intertwined nature of the defendants’ discussion, in a manner that would assure that the remaining, admissible portions were sufficiently coherent. Alternatively, the state elected to call Major Little to testify concerning the admissible portions of the conversation.
 

 The defendants objected asserting that: (1) the state did not mention in its opening statement that Major Little would testify; (2) Major Little’s testimony would present an incomplete and decontextualized rendering of the defendants’ | ^conversation which would amount to a confession; (3) if they attempted to cross examine Major Little concerning the conversation, they risked opening the door for the prosecution to play the tape in its entirety for the jury; and (4) Major Little’s testimony required severance of their cases in order to prevent a constitutional violation under
 
 Bruton v. United States,
 
 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).
 

 The trial court agreed with the defendants and ruled that Major Little could not testify, reasoning:
 

 I do believe that that statement is being offered out of context. There were a lot of other acts that were discussed, per the argument offered by defense counsel, other bad acts, burglaries and the like. I don’t think, I don’t think eliciting that particular statement in isolation would do justice to the entirety of that discussion between [the defendants] during the entire conversation that was had, apart from listening to the tape. I think it would be unfair.
 

 The state sought supervisory writs in this court, which reversed the trial court’s ruling prohibiting Major Little’s testimony, noting that the state had given the defendants sufficient notice of its intent to introduce statements by the defendants pursuant to La.C.Cr.P. art. 768, and that “the trial court previously ruled [the relevant] portions of those statements admissible.”
 
 See State v. McElveen,
 
 09-0278, unpub. (La.App. 4 Cir. 3/9/09). Thereafter, the Supreme Court denied the defendants’ writ application.
 
 State v. McElveen,
 
 09-0525 (La.3/10/09), 5 So.3d 105.
 

 Consideration of this assignment on appeal is barred by the “law of the case” doctrine. We find that the defendants’ argument that Major Little’s trial testimony materially differed from the contents of the "videotape and from the evidence anticipated in the writ application is erroneous. Major Little testified in conformity with the state’s
 
 in camera
 
 proffer: that he overhead the defendants discussing who | vfjwould “take” the charge for Mr. Lorino’s murder. Moreover, under cross examination, Major Little verified that neither of the defendants confessed to the crime.
 

 Defendants argue on appeal that the trial court curtailed counsel’s ability to take full advantage of La. R.S. 15:450
 
 [23]
 
 for fear of opening the door to the admission of other crimes evidence contained in the tape recorded conversation. We have already ruled that Major Little could testify as to evidence previously deemed admissible by the trial court. Thus, this court has already addressed the defendants’ concern that inadmissible other crimes evidence would somehow have become admissible
 
 *1082
 
 by the very act of defense counsel’s cross examining Major Little as to the circumstances surrounding the defendants’ statements.
 

 In any event, the defendants’ claim, that the trial court placed them in a “Catch-22” by forcing them to choose between allowing the jury to hear only their incomplete and deeontextualized “confession” through Major Little or allow it to be prejudiced by knowledge of prior bad acts, is unfounded. In
 
 State v. Moms,
 
 429 So.2d 111 (La. 1983), the Court ruled:
 

 ... [Wjhen the state seeks to introduce a confession, admission or declaration against a defendant which contains other crimes evidence, but which is otherwise fully admissible, the defendant has two options. He may waive his right to have the whole statement used, object to the other crimes evidence, and require the court to excise it before admitting the statement; or, he may insist on his right to have the statement used in its entirety so as to receive any exculpation or explanation that the whole statement may afford....
 

 Id.
 
 at 121.
 

 The defendants were in no danger of opening the door for the admission of the other crimes evidence contained on the tape recording of their conversation by counsel’s mere questioning of Major Little about the circumstances surrounding that conversation, absent counsel bringing up the subject of those crimes. Under La. R.S. 15:450, the defendants were entitled to introduce evidence of the complete context of the conversation while at the same time excising the portions that the trial court had previously ruled inadmissible. That the defendants did not take advantage of their lawful opportunities to cross examine Major Little is not the fault of the court. Contrary to their assertion that the trial court allowed the “confession” into evidence, we note that defense counsel specifically elicited on cross examination that neither defendant confessed to any crime to Major Little.
 

 Likewise, the defendant’s argument — that Major Bruce Little’s testimony was not mentioned in the state’s opening statement — is procedurally barred from appellate review by the “law of the case” doctrine. This court has already considered this issue holding that “[t]he State is not required to inform the jury in opening statements of its intent to use a confession or inculpatory statement.”
 
 See State v. McElveen,
 
 09-0278, unpub. (La.App.4 Cir. 3/9/09).
 

 La.C.Cr.P. art. 766 provides that “[t]he opening statement of the state shall explain the nature of the charge, and set forth, in general terms, the nature of the evidence by which the state expects to prove the charge.” The purpose of an opening statement is to acquaint the jury with the case in order to prevent confusion, and to protect the defendant from being taken by surprise or prejudiced in the preparation of his defense.
 
 State v. Koontz,
 
 98-367, p. 9 (La.App. 5 Cir. 11/25/98), 722 So.2d 1081, 1085. The state need only set forth the theory of its 178case in general terms in the opening statement.
 
 Id.
 
 It is not necessary that the state detail every shred of evidence; rather, it is sufficient that the state give a general description of the evidence it plans to introduce.
 
 Id.,
 
 p. 9, 722 So.2d at 1085-86. The scope of the opening statement is left to the sound discretion of the trial judge.
 
 State v. Bolen,
 
 338 So.2d 97, 99 (La.1976).
 

 La.C.Cr.P. art. 769 provides:
 

 Evidence not fairly within the scope of the opening statement of the state shall not be admitted in evidence.
 

 If the state offers evidence that was inadvertently and in good faith omitted
 
 *1083
 
 from the opening statement, the court, in its discretion may admit the evidence if it finds that the defendant is not taken by surprise or prejudiced in the preparation of his defense.
 

 In
 
 State v. Sneed,
 
 316 So.2d 372, 378 (La.1975), the Court determined that the admission of the defendant’s inculpatory statement at trial was not error even though the statement was not mentioned in the state’s opening statement where the defendant had been made aware of the statement through pre-trial discovery.
 

 In the case at bar, judging by the pretrial appellate record concerning the statements made by the defendants in this case, the defendants had ample knowledge of the substance of the statements that the state intended to introduce at trial prior to the state’s opening statement. Thus, the defendants have not met their burden of demonstrating error on the part of the trial court in admitting the testimony of Major Little despite the state’s failure to mention the defendants’ statements in its opening.
 

 The final argument in this assignment concerns the defendants’
 
 Bruton
 
 claim that Major Little’s testimony necessitated separate trials because the defendant was prevented from cross examining his co-defendant, who opted not to testify, regarding the inculpatory statement against him. The defendants contend that if 17flthe state had given notice that one of the defendants said, “which one of us should take the charge,” then the other defendant would have refused to waive severance, and would have insisted on cross examining the declarant defendant about the statement.
 

 The record indicates that in fact the defendants had notice of the contents of their recorded statement. Defense counsel had notice of the precise substance of their statements and heard the audiotape prior to trial, as evidenced by Thatcher’s motion to sever filed on 15 March 2004 that was based in part on this very issue. Although the record does not reflect it, the trial court granted severance. The defendants later agreed to a joint trial in exchange for the state’s amending the indictment to charge second-degree murder. Consequently, any
 
 Bruton
 
 issue was waived by the defendants when they stood trial without objection and, failed to move for a mistrial following Major Little’s testimony.
 

 Severances are generally governed by La.C.Cr.P. arts. 704 and 705. A severance is necessary if the defenses of the co-defendants are mutually antagonistic to the extent that one co-defendant attempts to blame the other, causing each defendant to defend against both his co-defendant and the state.
 
 State v. Prudholm,
 
 446 So.2d 729, 741 (La.1984). A defendant is not entitled to a severance as a matter of right, but the decision is one resting within the sound discretion of the trial court.
 
 Id.,
 
 446 So.2d at 741. Mere unsupported allegations that defenses will be antagonistic is not sufficient to require a severance.
 
 Id.,
 
 446 So.2d at 741. Where the thrust of the co-defendant’s testimony is simply to deny his own involvement and not implicate the other defendant, justice does not require a severance; this rule applies even though the co-defendant’s testimony may, by inference, be damaging to the other defendant.
 
 State v. Brown,
 
 527 So.2d 12, 14 (La.App. 3rd Cir.1988). When a confession or statement involves both defendants as principals and only the extent of participation is contradictory, the defenses are not antagonistic and the degree of blame each defendant seeks to cast on the other does not warrant a severance.
 
 State v. Williams,
 
 416 So.2d 914, 916 (La.1982).
 

 
 *1084
 
 In this case, the statements made by the defendants while in the presence of Major Little did not amount to a confession. In fact, Major Little pointedly testified that neither defendant confessed to any crime to him. The defendants were tried as principals, and their mutual defense was that neither of them killed Mr. Lorino. Based on the facts of this case, severance was not mandated upon the introduction of the testimony of Major Little.
 

 This assignment has no merit and the defendants’ collective confrontation claims do not entitle them to relief.
 

 TERRY’S ASSIGNMENT OF ERROR NUMBER 7
 

 In this assignment, Terry argues that the trial court erred in denying his motion for mistrial based on the admission of the victim impact testimony given by Mrs. Anna Lorino (“Mrs. Lorino”), the victim’s mother. The defendant contends that the testimony was prejudicial and violated his constitutional rights to due process and a fair trial.
 

 At trial, Mrs. Lorino testified that her son was a twenty-one year old Tulane University senior on 9 September 2002 and lived at 1011 Fourth Street with two roommates. She described her son’s height and weight and identified a picture of him. Mrs. Lorino cried during testimony, which, in turn, caused another woman in the courtroom to cry. The defense objected to the testimony, and the trial judge admonished the audience:
 

 | si Ladies, I understand the emotional nature, audience, of the testimony, but please control yourself otherwise I will have to ask you to step outside of the courtroom, please.
 

 Mistrial is a drastic remedy that is only authorized where substantial prejudice will otherwise result to the defendant.
 
 State v. Adams,
 
 07-0977, p. 5 (La.App. 4 Cir. 1/23/08), 976 So.2d 757, 760. “The determination of whether actual prejudice has occurred, and thus whether a mistrial is warranted, lies within the sound discretion of the trial judge, and this decision will not be overturned on appeal absent an abuse of that discretion.”
 
 State v. Wessinger,
 
 98-1234, p. 24 (La.5/28/99), 736 So.2d 162, 183.
 

 Citing La.C.Cr.P. art. 905.2,
 
 [24]
 

 State v. Bernard,
 
 608 So.2d 966 (La.1992), and
 
 State v. Gomez,
 
 00-0566 (La.1/17/01), 778 So.2d 549, the defendant argues that “victim impact statement” is a term used to describe evidence of the character of a homicide victim and the effect of the death on his or her family, and such evidence is relevant and admissible only at the penalty phase of a capital trial in order to permit the jury to assess meaningfully the defendant’s moral culpability and blameworthiness.
 

 
 *1085
 
 | ^Statutory and jurisprudential law support the defendant’s argument as to the content and relegation of victim impact evidence to the sentencing hearing for a capital case. However, the defendant mis-characterizes Mrs. Lorino’s testimony. Mrs. Lorino’s testimony did not amount to inadmissible “victim impact” testimony because she neither related to the jury the effect the victim’s death had upon the family nor did she expound on his individuality.
 
 See State v. Holmes,
 
 06-2988 (La.12/2/08), 5 So.3d 42. Instead, Mrs. Lorino recounted the victim’s age, living situation, and physical build at the time of his death. Mrs. Lorino’s and the audience’s display of emotion did not render her testimony “victim impact.” Moreover, Mrs. Lorino’s testimony and the photograph established the victim’s size, which was relevant to Ms. Smith’s testimony that she saw the attackers carry the victim.
 

 La. C.E. art. 401 defines relevant evidence as “evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” “A trial court’s ruling as to relevancy will not be disturbed absent a clear abuse of discretion.”
 
 State v. Lewis,
 
 97-2854, p. 20 (La.App. 4 Cir. 5/19/99), 736 So.2d 1004, 1017. A trial court is vested with much discretion in determining whether the probative value of relevant evidence is substantially outweighed by its prejudicial effect.
 
 See State v. Lambert,
 
 98-0730, p. 22 (La.App. 4 Cir. 11/17/99), 749 So.2d 739, 755.
 

 Even if error existed in admitting the testimony, such error was harmless. Mrs. Lorino’s testimony and her emotional display did not contribute to the jury’s verdict. Rather, the overwhelming evidence of the defendant’s guilt guided the jury in its decision. The trial court did not err in denying the defendant’s request | ^for mistrial based on Mrs. Lorino’s testimony. We find this assignment is meritless.
 

 TERRY’S ASSIGNMENT OF ERROR NUMBER 8
 

 Terry claims the trial court erred by denying his motion to suppress the physical evidence collected at the McEl-veen residence. He contends that Ms. McElveen’s intoxication and mental illness vitiated valid consent to search the residence. Further, he argues that she did not possess the legal authority to allow police to search the defendant’s belongings.
 

 It is a basic tenet of ■ Fourth Amendment law that warrantless searches and seizures are presumptively unreasonable.
 
 State v. Jason,
 
 10-0658, p. 6 (La.App. 4 Cir. 12/1/10), 53 So.3d 508, 511, citing
 
 Payton v. New York,
 
 445 U.S. 573, 587, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). The United States Supreme Court employs the principle of reasonableness to every manner of warrantless search case. Reasonableness is “judged by balancing [a search’s] intrusion on the individual’s Fourth Amendment interests against its promotion of legitimate governmental interests.”
 
 Skinner v. Railway Labor Executives’ Ass’n,
 
 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989).
 

 Consent to search is a well-recognized exception to the search warrant requirement.
 
 Schneckloth v. Bustamante,
 
 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973);
 
 State v. Strange,
 
 04-0273, p. 6 (La.5/14/04), 876 So.2d 39, 42. In order to rely upon the consent exception, the burden is on the prosecution to prove that consent was freely and voluntarily given.
 
 State v. Singleton,
 
 01-1070, pp. 6-7 (La.App. 4 Cir. 9/25/02), 828 So.2d 1185, 1190. A determination of whether consent to a search was voluntarily given
 
 *1086
 
 involves consideration of the “totality of the circumstances.”
 
 Schneckloth,
 
 412 U.S. at 227, 93 S.Ct. 2041. The fact that an accused has been using alcohol, |S4though certainly a relevant factor to the determination, will not alone render the consent involuntary.
 
 State v. Strange,
 
 334 So.2d 182, 184 (La.1976).
 

 A party’s voluntary consent to search is a question of fact to be determined by the trial court under the facts and circumstances of the particular case, and its determination is entitled to great weight on review.
 
 State v. Mayberry,
 
 00-1037, p. 9 (La.App. 4 Cir. 5/9/01), 791 So.2d 725, 733.
 

 The defendant does not provide any details as to how the evidence at trial or at the motion to suppress hearing supports a finding that Ms. McElveen was too drunk and/or mentally ill at the time she gave consent to search the McElveen’s Fourth Street residence. Consequently, without a detailed statement of facts, the defendant’s argument alone is insufficient to show trial court error.
 

 In any event, Ms. McElveen testified that she freely gave police written consent to search her Fourth Street residence. She admitted that she had been drinking on the day she gave the consent; however, that fact alone is insufficient by itself to eviscerate the voluntariness of her consent. Detective Matthews testified that he knew Ms. McElveen had been drinking that day, but he, as well as Detective Hoobler, testified that he did not detect any signs of intoxication when Ms. McElveen described the events of 9 September 2002, and signed the consent to search form. Further, Detective Matthews testified that had he believed Ms. McElveen was intoxicated, he would not have allowed her to sign the consent form.
 

 Moreover, the defendant has not presented any evidence that Ms. McElveen was suffering from any mental defect or perception problems at the time she gave her consent to search. Rather, concerning both her alleged intoxication and mental problems at the time she consented to the search, her description of the events of 9 | .^September 2002 and of the defendants on that date is corroborated by the physical evidence linking them to the murder of Mr. Lorino. The defendant has not shown that the trial court erred in finding Ms. McElveen’s consent voluntary.
 

 As for Ms. McElveen’s authority to consent to the search of the defendant’s belongings found at the McElveen residence, again, the defendant fails to present a factual basis on which to reverse the trial court’s denial of his motion to suppress. Ms. McElveen gave uncontroverted testimony at trial that she resided at the Fourth Street residence with her son, Thatcher, and that Terry lived elsewhere on the same street. Nothing in the record indicates that Terry resided at his mother’s residence on Fourth Street, only that he took naps and showered there. The facts do not support an assertion that the defendant had a reasonable expectation of privacy because no area existed over which he had exclusive use.
 
 State v. Cover,
 
 450 So.2d 741, 746 (La.App. 5 Cir.1984). Thus, the defendant enjoyed a lesser expectation of privacy in a residence in which he did not reside. Even so, an invasion of privacy may be justified by the consent of “... a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.”
 
 United States v. Matlock,
 
 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).
 

 The defendant has failed to carry his burden of demonstrating that the trial court erred by refusing to suppress the evidence. The trial court did not err in
 
 *1087
 
 denying the defendant’s motion to suppress.
 

 This assignment of error has no merit.
 

 J^THATCHER’S ASSIGNMENT OF ERROR NUMBER 8
 

 By this assignment, Thatcher claims the state failed to lay a proper foundation to admit into evidence the white T-shirt stained with Mr. Lorino’s blood, because the state did not prove the chain of custody from the defendant’s Fourth Street residence through Crime Lab testing and to Central Evidence and Property.
 

 In order to introduce demonstrative evidence at trial, the law requires that the object be identified. This identification may be visual
 
 (ie.,
 
 by testimony at the trial that the object exhibited is the one related to the case) or it may be by chain of custody (ie., by establishing the custody of the object from the time it was seized to the time it was offered in evidence).
 
 State v. Sweeney,
 
 443 So.2d 522, 528 (La.1983).
 

 Evidence as to custody need not eliminate all possibility that the object has been altered; rather, for admission, it suffices that it is more probable than not that the object is the one connected to the case.
 
 State v. Ferguson,
 
 09-1422, p. 33 (La.App. 4 Cir. 12/15/10), 54 So.3d 152, 170-71. The trial court is vested with great discretion when determining whether a party has laid a proper foundation for the introduction of evidence.
 
 Id.
 

 Here, Ms. Smith testified that one of Mr. Lorino’s attackers wore a white T-shirt. A white T-shirt with a red Polo Ralph Lauren badge containing Mr. Lori-no’s blood was discovered at the McEl-veens’ residence after the murder. Both Detective Hoobler, who discovered the T-shirt, and Officer Cuadrado, who collected it, identified the shirt at trial as being the one found at the McElveen’s residence. The shirt was later identified by appearance and its unique Central Evidence and Property barcode — 236897—by Mr. Tafaro and Dr. Montgomery, |S7who conducted serology and DNA tests on it. Dr. Montgomery also identified the internal DNA Lab sample numbers — 133 and 134 — corresponding to the particular cutouts from that white T-shirt that contained Mr. Lori-no’s blood.
 

 The relevant witnesses each described in detail their role in the chain of custody from the time the shirt was first logged into Central Evidence and Property, to its progress through the serology and DNA labs, to its final return to Central Evidence and Property; the state introduced documentation memorializing that chain. Even considering the defendant’s claim that Ms. Smith did not identify the T-shirt as the one worn by one of Mr. Lorino’s attackers on 9 September 2002, the fact remains that both Detective Hoobler and Officer Cua-drado positively identified the shirt as having been found in the McElveen residence, stained with the victim’s blood. The state demonstrated that the T-shirt identified by the trial witnesses was more probably than not the one connected to the murder of Mr. Lorino.
 

 This assignment of error has no merit.
 

 TERRY’S ASSIGNMENT OF ERROR NUMBER 9
 

 In this assignment, Terry complains that the verdict form was defective as it failed to specify whether the jury found Terry guilty of second-degree murder based on a felony murder or specific intent murder theory. In support of his argument, the defendant cites
 
 Richardson v. United States,
 
 526 U.S. 813, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999). In
 
 Richardson,
 
 the defendant was charged with engaging in a “continuing criminal enterprise” involving a series of federal narcotics offenses which required a unanimous finding by the jury
 
 *1088
 
 that he had engaged in at least three separate violations. Prior to deliberation, the trial court denied Richardson’s proposed 1 ^instruction that jurors had to be unanimous on deciding which three specific offenses he had committed. Instead, the trial court charged the jury that they must find only that he had committed at least three separate acts.
 

 Richardson’s conviction was reversed on the grounds that each of the three violations found by the jury constituted a separate factual element of the charge, and, thus, that the trial court’s instruction to the contrary had violated Richardson’s due process rights. The majority concluded that the government’s requirement of proving, as a factual element, a “continuing series of violations” required that the jury be unanimously satisfied as to each of the three specific violations upon which its verdict is based.
 
 Richardson,
 
 526 U.S. at 820, 119 S.Ct. 1707
 

 Richardson
 
 is distinguishable from this case in two ways. First, the holding is specifically confined to federal convictions, and is thus inapplicable to state prosecutions.
 
 See Id.
 
 at 815, 119 S.Ct. 1707 (“We hold that ... a jury in a federal criminal case brought under § 848 must unanimously agree not only that the defendant committed some ‘continuing series of violations’ but also that the defendant committed each of the individual ‘violations’ necessary to make up that ‘continuing series.’ ”).
 

 Second, unlike the federal continuing criminal enterprise statute, Louisiana’s second-degree murder statute does not require a conjunctive
 
 [25]
 
 finding that a defendant committed a certain number of enumerated felonies or committed both felony murder and specific intent murder in order for a jury to convict. Louisiana’s ^statute is disjunctive — that is, the jury must have found only that the defendant killed Mr. Lorino either with specific intent or during the commission of an enumerated felony; either is sufficient to sustain a conviction. A legal verdict of “guilty of second-degree murder” suffices to assure that the requisite number of jurors must have found one or the other.
 

 Under Louisiana law, the “felony murder” and “specific intent” prongs do not represent independent elements of second-degree murder, but, rather, independent theories of the
 
 mens rea
 
 required to have been possessed by the defendant. The jury’s factual finding of either, to the complete exclusion of the other, is sufficient to sustain a verdict of guilty. The jury’s verdict form reflecting that it found the defendant guilty of second-degree murder was constitutional.
 

 Contrary to the defendant’s position, the verdict form does not preclude appellate review of the sufficiency of the state’s evidence; this court may determine from the testimony and evidence produced whether the prosecution satisfied either
 
 mens rea
 
 prong of La. R.S. 14:30.1. Using this argument, the defendant raises a second sufficiency of the evidence argument; however, the state notes that the evidence was sufficient, based on the law discussed earlier, for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to have found beyond a reasonable doubt that Terry and Thatcher murdered Mr. Lorino with the specific in
 
 *1089
 
 tent to kill or cause great bodily harm to him. The jury’s verdict form does not inhibit that analysis.
 

 This assignment has no merit.
 

 Ian
 
 TERRY’S ASSIGNMENT OF ERROR NUMBER 10
 

 In this assignment, Terry maintains that the trial court erred when it refused to give defense-requested jury charges pertaining to the chain of custody, spoliation of the evidence, and the defense theory of the case.
 

 La.C.Cr.P. art. 802 requires the trial court to charge the jury as to the law applicable to the case. Under La. C.Cr.P. art. 807, a requested special jury charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. The special charge need not be given if it is included in the general charge or in another special charge to be given.
 
 State v. Hollins,
 
 08-1033, p. 3 (La.6/26/09), 15 So.3d 69, 71. Failure to give a requested jury instruction constitutes reversible error only when a miscarriage of justice, prejudice to the substantial rights of the accused, or a substantial violation of a constitutional or statutory right exists.
 
 Id.
 

 The first of the defendant’s proposed jury charges provides:
 

 The State bears the burden of proof beyond a reasonable doubt in connection with all evidence it seeks to introduce. Before you may rely upon any piece of evidence, the State must establish beyond a reasonable doubt the integrity of the chain of custody for that piece of evidence.
 

 The defendant’s proposition that the state must prove to the jury every link in the chain of custody beyond a reasonable doubt is not supported by law or jurisprudence. The foregoing charge would have required qualification and/or explanation to the jury. The trial court would have had to instruct the jury that under Louisiana law, the prosecution has the burden of establishing only “that it is more probable than not that the evidence is connected with the offense.”
 
 See State v. Tauzier,
 
 397 So.2d 494, 502 (La.1981). The law does not require that the | m evidence as to custody eliminate every possibility that the object has been altered. For admission, it suffices that it is more probable than not that the object is the one connected to the case.
 
 State v. Frey,
 
 568 So.2d 576, 578 (La.App. 4th Cir.1990). Besides, any defect in the chain of custody goes to the weight of the evidence rather than the admissibility.
 
 State v. Jackson,
 
 96-2540, pp. 2-3 (La.App. 4 Cir. 11/26/97), 706 So.2d 494, 496. Therefore, the trial court did not err in refusing to give the defense-requested jury charge concerning the chain of custody of the evidence.
 

 Turning to the defendant’s requested charge as to the spoliation of evidence, the proposed charge read:
 

 If you find that the State of Louisiana has negligently or inadvertently destroyed or lost any evidence whose contents are in issue, you may presume or infer that the evidence, if available, would have been adverse to the State’s interest. If you find that the State of Louisiana intentionally or in bad faith permitted the loss or destruction of evidence, you shall infer that the evidence would eliminate the defendant as a suspect.
 

 The requested instruction was not pertinent to the case. No evidence presented the issue that any of the relevant evidence involved in the case was “negligently or inadvertently” destroyed by the state, let alone in bad faith. In fact, Dr. Montgomery told the court that the case file relating to Mr. Lorino’s murder survived Hur
 
 *1090
 
 ricane Katrina intact. Consequently, the trial court did not err in denying the defendant’s requested jury charge on spoliation.
 

 The defendant’s third requested jury charge read as follows:
 

 The defense theory of the case is that the DNA evidence on this knife belonged to the perpetrator in this case. The defense has elicited evidence that the weapon contained DNA from both the victim and an unknown subject. The defense has presented evidence that neither Terry nor Thatcher McElveen’s DNA is on the weapon. |flaIf you believe that the defense has established a reasonable hypothesis of innocence, you must acquit the defendants. The defense has challenged the integrity of the State’s evidence, described throughout this trial as the Ralph Lauren Red and White T-shirt. The defense has suggested to you that the chain of custody in this evidence depends upon witnesses who ... are not reliable beyond a reasonable doubt. If you have a reasonable doubt about this piece of evidence, you must acquit.
 

 The defendant is not entitled to a judicial retelling of the defense theory of the case and the specific evidence on which that theory is based. If given, it would be a prohibited comment by the judge about the evidence in the case. The only relevant part of the defendant’s requested instruction — that if the jury has a reasonable doubt about the chain of custody relating to the white T-shirt, it must acquit — is incorrect. As the triers of fact and judges of the weight and credibility of the evidence, the jury was not required to find that any defect in the chain of custody or even doubt as to the integrity of the white T-shirt required acquittal. The jury was entitled to disregard that piece of evidence and lawfully find, based on the testimony of Ms. Smith, Ms. McElveen, and Major Little, that the defendant was guilty beyond a reasonable doubt. Moreover, no evidence existed to support the defense theory regarding Mr. Tafaro’s or Detective Hoobler’s handling of the evidence in question.
 

 The trial court’s general instruction informed the jury that it was “to give each of these defendants the benefit of every reasonable doubt arising out of the evidence or lack of evidence in this case.” Moreover, the jury was instructed that in evaluating a witness’ credibility, it could “take into account ... their bias, corruption or defective capacity and every circumstance surrounding the giving of their testimony,” and that jurors were justified in disregarding a witness’ testimony entirely if they believed that he or she “willfully and deliberately testified falsely toj^any material fact.” Thus, the trial court properly instructed the jury and did not err in refusing to give the charges requested by the defendant.
 

 This assignment of error has no merit.
 

 TERRY’S ASSIGNMENT OF ERROR NUMBER
 
 11
 
 [26]
 

 hJn his eleventh assignment of error, Terry argues that the jury’s verdict
 
 *1091
 
 is unconstitutional because it was non-unanimous in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.
 

 The defendants herein were convicted of the second-degree murder of Mr. Lorino by a vote of eleven to one.
 

 
 *1092
 
 Louisiana Constitution Article I, § 17(A) provides that a case “in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, ten of whom must concur to render a verdict.” Additionally, La.C.Cr.P. art. 782(A) provides in part that “[c]ases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict.”
 

 In
 
 Apodaca v. Oregon,
 
 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972), the United States Supreme Court stated:
 

 [T]he purpose of trial by jury is to prevent oppression by the Government by providing a safeguard against the corrupt or overzealous prosecutor and against the complaint, biased, or eccentric judge.’
 
 Duncan v. Louisiana,
 
 391 U.S. 145 at 156, 88 S.Ct. 1444 at 1451, 20 L.Ed.2d 491 (1968) ... Given this purpose, the essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen ...
 
 Williams v. Florida, supra,
 
 399 U.S. 78 at 100, 90 S.Ct. 1893 at 1906, 26 L.Ed.2d 446 (1970). A requirement of unanimity, however, does not materially contribute to the exercise of this commonsense judgment. As we said in
 
 Williams,
 
 a jury will come to such a judgment as long as it consists of a group of laymen representative of a cross section of the community who have the duty and the opportunity to deliberate, free from outside attempts at intimidation, on the question of a defendant’s guilt. In terms of this function we perceive no difference between juries required to act unanimously and those permitted to convict or acquit by votes of 10 to two or 11 to one. Requiring unanimity would obviously produce hung juries in some situations where non-unanimous juries will convict or acquit. But in either case, the interest of the defendant in having the judgment of his peers interposed 19fibetween himself and the officers of the State who prosecute and judge him is equally well served. [Emphasis supplied.]
 

 In
 
 State v. Boudreaux,
 
 08-1504 (La.App. 4 Cir. 9/29/10), 48 So.3d 1144, this court noted:
 

 In
 
 State v. Bertrand,
 
 2008-2215 (La.3/17/09), 6 So.3d 738, the trial court found that La.C.Cr.P. art. 782(A) violated the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, relative to the number of jurors needed to concur to render a verdict in cases in which punishment is necessarily confinement at hard labor, the same issue raised by the defendant in the instant case. On direct appeal by the State, the Louisiana Supreme Court reversed, stating in its conclusion:
 

 Due to this Court’s prior determinations that Article 782 withstands constitutional scrutiny, and because we are not presumptuous enough to suppose, upon mere speculation, that the United States Supreme Court’s still valid determination that non-unanimous 12 person jury verdicts are constitutional may someday be overturned, we find that the trial court erred in ruling that Article 782 violated the Fifth, Sixth, and Fourteenth Amendments. With respect to that ruling, it should go without saying that a trial judge is not at liberty to ignore the controlling jurisprudence of superior courts.
 
 Bertrand,
 
 2008-2215, p. 8, 6 So.3d at 743.
 

 This Court cited and relied on
 
 Bertrand in State v. Barbour,
 
 2009-1258 (La.App. 4 Cir. 3/24/10), 35 So.3d 1142, to reject the argument that the trial court had erred in denying the
 
 *1093
 
 defendant’s motion to declare La. C.Cr.P. art. 782(A) unconstitutional as violative of the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution.
 

 As stated by the Louisiana Supreme Court in
 
 Bertrand
 
 under current jurisprudence from the U.S. Supreme Court, non-unanimous twelve-person jury verdicts are constitutional, and La.C.Cr.P. art. 782(A) is constitutional. [Emphasis supplied.]
 

 See also,
 
 State v. Barbour,
 
 09-1258 (La.App. 4 Cir. 3/24/10), 35 So.3d 1142,
 
 writ denied,
 
 10-0934 (La.11/19/10), 49 So.3d 396,
 
 cert. denied, Barbour v. Louisiana,
 
 — U.S. -, 131 S.Ct. 1477, 179 L.Ed.2d 302 (2011).
 

 We are bound by the jurisprudence of the Louisiana Supreme Court and, accordingly, this assignment of error lacks merit.
 

 TERRY’S ASSIGNMENT OF ERROR NUMBER 12
 

 In his twelfth assignment of error, Terry complains his life sentence without the possibility of parole is unconstitutionally excessive; however, the defendant offers no factual or legal support for his argument.
 

 In
 
 State v. Smith,
 
 01-2574, p. 7 (La.1/14/03), 839 So.2d 1, 4, the Court set forth the standard for evaluating a claim of excessive sentence:
 

 Louisiana Constitution of 1974, art. I, § 20 provides, in pertinent part, that “[n]o law shall subject any person to ... excessive ... punishment.” (Emphasis added.) Although a sentence is within statutory limits, it can be reviewed for constitutional excessiveness.
 
 State v. Sepulvado,
 
 367 So.2d 762, 767 (La.1979). A sentence is unconstitutionally excessive when it imposes punishment grossly disproportionate to the severity of the offense or constitutes nothing more than needless infliction of pain and suffering.
 
 State v. Bonanno,
 
 384 So.2d 355, 357 (La.1980). A trial judge has broad discretion when imposing a sentence and a reviewing court may not set a sentence aside absent a manifest abuse of discretion.
 
 State v. Cann,
 
 471 So.2d 701, 703 (La.1985). On appellate review of a sentence, the relevant question is not whether another sentence might have been more appropriate but whether the trial court abused its broad sentencing discretion.
 
 State v. Walker,
 
 2000-3200, p. 2 (La.10/12/01), 799 So.2d 461, 462; cf.
 
 State v. Phillips,
 
 2002-0737, p. 1 (La.11/15/02), 831 So.2d 905, 906.
 

 In
 
 State v. Batiste,
 
 06-0875, p. 18 (La.App. 4 Cir. 12/20/06), 947 So.2d 810, 820, this court further explained:
 

 |98An appellate court reviewing a claim of excessive sentence must determine whether the trial court adequately complied with the statutory guidelines in La.C.Cr.P. art. 894.1, as well as whether the facts of the case warrant the sentence imposed.
 
 State v. Landry,
 
 [2003— 1671 (La.App. 4 Cir. 3/31/04), 871 So.2d 1235,]
 
 supra; State v. Trepagnier,
 
 97-2427 (La.App. 4 Cir. 9/15/99), 744 So.2d 181. However, as noted in
 
 State v. Major,
 
 96-1214, p. 10 (La.App. 4 Cir. 3/4/98), 708 So.2d 813:
 

 The articulation of the factual basis for a sentence is the goal of Art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, resen-tencing is unnecessary even when there has not been full compliance with Art. 894.1.
 
 State v. Lanclos,
 
 419 So.2d 475 (La.1982). The reviewing court shall not set aside a sentence for excessiveness if the record supports
 
 *1094
 
 the sentence imposed. La.C.Cr.P. art. 881.4(D).
 

 At the sentencing hearing in the case at bar, the trial judged stated:
 

 This crime had all the characteristics that society fears most. It was brutal, it was vicious. It was unprovoked, senseless and it occurred in broad daylight. Jonathan opened the door and let you in. He treated you like a neighbor, if not like a friend. He knew you. Yet you took advantage of his kindness in the worst possible way. You took a knife from his kitchen drawer and you held, you stabbed him repeatedly until he died.
 

 All this occurred while his friend and roommate watched, helpless to assist her friend and fearful of her own life. A promising young life was taken here. A life full of hope and possibilities for the future. All that’s gone now all because of your senseless act of brutality. I’m certain that the pain of losing a son will remain with Jonathan Lorino’s father and his entire family for the rest of their days. I wish there was something this Court or this system could do to bring him back....
 

 The most this Court can do is to hold you accountable, Thatcher and Terry, for the unending nightmare that you’ve created for the entire Lorino family and to protect society from anyone else being hurt in this way.
 

 Thatcher and Terry you have committed a horrible crime, a horrible crime and for that you must pay a horrible price. Terry McElveen, you |fl;>are sentenced to a term of life in prison without benefit of probation, parole or suspension of sentence....
 

 The judge complied with the sentencing guidelines, noting the gravity/dangerousness of the offense; the viciousness of the crime; the harm done to the victim; the risk/danger the defendant posed to the public; and the defendant’s apparent disregard for human life. This court has determined that a life sentence upon conviction for second-degree murder is not excessive.
 
 See State v. Alien,
 
 03-2156 (La.App. 4 Cir. 5/19/04), 876 So.2d 122.
 

 Considering the judge’s comments at sentencing and the jurisprudence, this assignment is meritless.
 

 TERRY’S ASSIGNMENT OF ERROR NUMBER 13
 

 In this assignment of error, the defendant alleges that the incompleteness of the trial court record deprives him of meaningful appellate review of his conviction, based on the disorganization of the record volumes, out of order presentation of some of the witness testimony, and the missing transcript of some court hearings over the course of the seven years between indictment and conviction.
 

 In
 
 State v. Demise,
 
 98-0541 (La.4/3/01), 802 So.2d 1224, the Court addressed a similar complaint by a defendant regarding alleged deficiencies in his appellate record. The Court stated:
 

 Both this court and the United States Supreme Court have made clear that a criminal defendant has a right to a complete transcript of the trial proceedings ... Further, in Louisiana, a defendant is constitutionally guaranteed the right of appeal “based upon a complete record of all the evidence upon which the judgment is based.” La. Const, art. I, § 19. Thus, material omissions |innfrom the transcript of the proceedings at trial bearing on the merits of an appeal will require reversal.... On the other hand, inconsequential omissions or slight inaccuracies do not require reversal, as an incomplete record may nonetheless be adequate for appellate review.... Finally, a defendant is not entitled to
 
 *1095
 
 relief because of an incomplete record absent a showing of prejudice based on the missing portions of the transcripts.
 

 Id.,
 
 98-0541 p. 10-11, 802 So.2d at 1234 (citations omitted).
 

 However, a complete appellate review of a defendant’s conviction and sentence can be accomplished even when there are missing portions of the trial record.
 
 See State v. Massey,
 
 09-1728 (La.App. 4 Cir. 11/5/10), 51 So.3d 808. Where the record includes a complete transcript of the evidentiary portion of the trial, the defendant’s “constitutional right to a judicial review of all evidence” has not been compromised.
 
 State v. Richard,
 
 96-0331, pp. 4-5 (La.App. 4 Cir. 12/22/99), 750 So.2d 330, 332-33.
 

 The defendant points to minor inadequacies in the record that do not substantially affect his right to meaningful appellate review. The fact that the record contains both alphabetic and numerical in-dices has no bearing on his right to review of his conviction, nor does the out-of-order presentation of witness testimony somehow deprive him of the substance thereof. Moreover, the correct order of witnesses is discernable by the content of the testimony.
 
 See also
 
 La. C.E. art. 611; La.C.Cr.P. art. 673.
 

 The defendant’s complaint about the record’s reference to an improper verdict is likewise of no moment as to the validity of the conviction. While the cited page indicates that the jury first returned with a verdict that the trial court evidently determined was rendered by an insufficient number of jurors, the record does nonetheless indicate that the jury subsequently returned a valid verdict.
 

 1101Although the defendant complains of the absence from the record of a jury note, he has not shown how the substance of that note prejudices his right to review, absent some discernable defect in the proceedings that he can refer to. Likewise, he has not shown how the failure to identify prospective jurors by name in portions of the voir dire precludes a fair and full review, absent some evidence that an answer given by a prospective juror furthers a
 
 Batson
 
 claim.
 

 As for the defendant’s argument that he is prejudiced by the absence of the transcription of the hearing on his Motion for New Trial and
 
 Prieur
 

 [27]
 

 ''
 
 hearing, the Motion for New Trial was heard and denied on the same day as sentencing and is contained in the record. As to the
 
 Prieur
 
 issue, on 15 December 2008, the trial court ruled that the state could not introduce evidence of other bad acts at trial. The defendant has not particularized how the absence of the
 
 Prieur
 
 transcript has prejudiced him, considering that the trial court ruled in his favor. Nevertheless, the defendant was free to request the relevant transcript from the court reporter of Section “J” of Criminal District Court and supplement the current record with any of the referenced hearings or settings. That he chose not to inures to his detriment.
 

 Turning to the defendant’s complaint that a “large number” of bench conferences were not recorded, the Supreme Court has not articulated a
 
 per se
 
 rule either requiring the recording of bench conferences or exempting them from the scope of La.C.Cr.P. art. 843.
 
 [28]
 

 Deruise,
 
 p.
 
 *1096
 
 14, 802 So.2d at 1236. In
 
 State v.
 
 Hoffman,
 
 98-3
 
 118, pp. 49-50 (La.4/11/00), 768 So.2d 542, 586,
 
 opinion supplemented by,
 
 00-1609 (La.6/14/00), 768 So.2d 592, the Court interpreted article 843⅛ requirement that “objections” and “arguments” be recorded “as normally applying only to objections made in open court and the arguments of counsel in closing, because only these objections and arguments rise to a level of materiality sufficient to invoke Article 843.”
 
 Id.,
 
 p. 50, 768 So.2d at 586. The Court also notéd in
 
 Hoffman
 
 that the constitutional mandate that “evidence” be recorded does not encompass bench conferences, at least ones that do not satisfy the materiality requirements of La.C.Cr.P. art. 843.
 
 Id.
 
 The defendant has failed to demonstrate that he was prevented from presenting any relevant evidence and has failed to demonstrate any specific prejudice that he suffered as a result of those conferences not being transcribed; nothing in the record suggests that the conferences had a discernible impact on the proceeding. In the absence of demonstrated prejudice, the failure to record bench conferences does not constitute reversible error.
 

 Moreover, the defendant cannot claim that the cumulative errors in this case require reversal. He has not demonstrated a cumulative violation of his right to a fair trial by the mere aggregation of his individually meritless claims. This court’s review of all of the defendant’s assignments of error failed to uncover reversible error. The Louisiana Supreme Court has previously held that “the combined effect of the incidences complained of, none of which amounts to reversible error [does] not deprive the defendant of his right to a fair trial.”
 
 State v. Copeland,
 
 530 So.2d 526, 544-45 (La.1988).
 

 This assignment has no merit.
 

 |
 
 ,mTERRY’S ASSIGNMENT OF ERROR NUMBER 14
 

 Terry supplemented his brief with the submission of an additional assignment of error — that his Sixth Amendment right of confrontation was violated by the trial court’s allowing an expert who did not collect and test blood samples in this case to testify about those test results at trial.
 

 Terry notes that Serologist Deborah Lynn Wesley (“Ms. Wesley”) performed DNA testing on the white T-shirt found at the McElveen residence and which contained the victim’s blood. He argues the trial court erroneously allowed Dr. Montgomery,
 
 [29]
 
 who neither collected, tested, nor observed the testing of the blood sample in this case, to testify at trial, in contravention of the recent U.S. Supreme Court case
 
 Bullcoming v. New Mexico,
 
 564 U.S. -, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011).
 

 At the time
 
 of
 
 Mr. Lorino’s death in 2002 and the McElveens’ trial and conviction in 2009, La. R.S. 15:499
 
 [30]
 
 provided
 
 *1097
 
 that all criminalistics laboratories established by laws of this state or by laws of the United States, and all coroners, | unforensic pathologists, and other persons, partnerships, corporations, and other legal entities practicing in fields of knowledge and expertise in the gathering, examination, and analysis of evidence by scientific means, are authorized to make proof of examination and analysis of physical evidence by the certificate of the person in charge of the facility in which such examination and analysis is made.
 

 During that same time frame, La. R.S. 15:500 provided:
 

 In all criminal cases and in all cases in juvenile or family courts which are of a criminal nature, and in civil forfeiture proceedings arising from criminal activity, the courts of this state shall receive as evidence any certificate made in accordance with R.S. 15:499 subject to the conditions contained in this Section and R.S. 15:501. The certificate shall be received in evidence as
 
 prima facie
 
 proof of the facts shown thereon, and as
 
 pri-ma facie
 
 proof of proper custody of the physical evidence listed thereon from time of delivery of said evidence to the facility until its removal therefrom.
 

 La. R.S. 15:501 read:
 

 A. The party seeking to introduce a certificate made in accordance with R.S. 15:499 shall, not less than ten days prior to the commencement of the trial, give written notice of intent to offer proof by certificate. Such notice shall include a copy of the certificate.
 

 (B) (1) The party against whom such certificate is offered shall be permitted to subpoena on cross-examination, the person who performed the examination or analysis of the evidence. If the subpoena is requested at least five days prior to the commencement of trial or the person subpoenaed responds to the subpoena, the certificate shall not be prima facie proof of its contents or of proper custody.
 

 (2) When the attorney for the defendant, or the defendant acting in his own defense, requests that a subpoena issue to the person who performed the examination or analysis, the request shall be in writing and shall contain a certification that the attorney or the defendant intends in good faith to conduct the cross-examination.
 

 [insIn
 
 Bullcoming,
 
 the defendant was convicted of driving while intoxicated. The principal evidence against him was a forensic laboratory report certifying that his blood-alcohol concentration was well above New Mexico’s statutory limit for aggravated DWI conviction. The defendant’s blood sample was tested by Caylor, a forensic analyst, who completed, signed, and certified the report. However, the prosecution neither called Caylor to testify
 
 *1098
 
 nor asserted he was unavailable. In lieu of Caylor, the state called another analyst, Razatos, to validate the report. Although Razatos was familiar with the testing methods and procedures used to analyze the defendant’s blood, Razatos did not participate in or observe the test on the defendant’s blood sample. The defense objected, asserting that the introduction of Caylor’s report without his testimony violated the confrontation clause, but the trial court overruled the objection admitting the report as a business record and permitted Razatos to testify. The defendant was convicted.
 

 While his appeal was pending before the New Mexico Supreme Court, the United States Supreme Court decided
 
 Melendez-Diaz v. Massachusetts,
 
 557 U.S. -, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009). In affirming the defendant’s conviction, the New Mexico high court acknowledged that although the blood test report qualified as testimonial evidence under
 
 Melendez-Diaz,
 
 it nevertheless held that the report’s admission did not violate the confrontation clause because Caylor was only “a mere scrivener” who simply transcribed machine-generated test results and was qualified as an expert witness with respect to New Mexico’s forensic testing methods and procedures. The United States Supreme Court granted certiorari to address whether the confrontation clause permits the prosecution to introduce a forensic laboratory report containing a testimonial certification, made in order to prove a fact at a criminal trial, through the in-court testimony of an analyst who did 11(mnot sign the certification or personally perform or observe the performance of the test reported in the certification. The Court stated:
 

 Our answer is in line with controlling precedent: As a rule, if an out-of-court statement is testimonial in nature, it may not be introduced against the accused at trial unless the witness who made the statement is unavailable and the accused has had a prior opportunity to confront that witness. Because the New Mexico Supreme Court permitted the testimonial statement of one witness, i.e., Caylor, to enter into evidence through the in-court testimony of a second person, i.e., Razatos, we reverse that court’s judgment.
 

 Bullcoming,
 
 564 U.S. at -, 131 S.Ct. at 2713.
 

 The defendant in the case at bar argues that he is entitled to a new trial, citing
 
 Bullcoming’s
 
 holding that a defendant has a right to confront the witness who actually performed the relevant tests because: “[Sjurrogate testimony of the kind [the testifying witness] was equipped to give could not convey what [the actual analyst] knew or observed about the events his certification concerned.... Nor could such surrogate testimony expose any lapses or lies on the certifying analyst’s part.”
 
 Bullcoming,
 
 564 U.S. at -, 131 S.Ct. at 2714.
 

 In
 
 Melendez-Diaz,
 
 over a defense objection under
 
 Crawford v. Washington,
 
 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court held that an analyst’s affidavit that certain contraband tested positive for cocaine constituted “testimonial” evidence, and it was inadmissible in the absence of the trial testimony of the analyst who performed such tests, pursuant to the Confrontation Clause of the Sixth Amendment.
 
 Melendez-Diaz,
 
 557 U.S. at -, 129 S.Ct. at 2532. Justice Scalia, writing for the court, stated that the affidavit fell within the “core class of testimonial statements,” the sole purpose of which was to establish in court the identity of the substance removed from the accused as cocaine. The Court, in footnote 12, opined that a notice-
 
 *1099
 
 and-demand statute requiring the prosecution to |in7provide notice to the defendant of its intent to use an analyst’s report as evidence at trial, after which the defendant is given a period of time in which to object to the admission of the evidence absent the analyst’s appearance at trial, is constitutional.
 
 See also State v. Dukes,
 
 46,029 (La.App. 2 Cir. 1/26/11), 57 So.3d 489
 
 (Melendez-Diaz
 
 is not controlling in cases where the state has followed the proper procedures under La.R.S. 15:499,
 
 et seq.,
 
 and the admission of the certifícate of analysis into evidence at trial did not violate the defendant’s rights under the Confrontation Clause.).
 
 Cf. State v. Simmons,
 
 10-1508 (La.App. 4 Cir. 5/18/11), 67 So.3d 525,
 
 writs applied for
 
 2011-K-1280 (La.6/17/11).
 
 [31]
 

 The United States Supreme Court in
 
 Bullcoming,
 
 as it did in
 
 Melendez-Diaz,
 
 noted with approval other jurisdictions’ notice and demand procedures:
 
 [32]
 

 I ms • • • [N]otice-and-demand procedures, long in effect in many jurisdictions, can reduce burdens on forensic laboratories. Statutes governing these procedures typically, “render ... otherwise hearsay forensic reports admissible!,] while specifically preserving a defendant’s right to demand that the prosecution call the author/analyst of [the] report.” See
 
 Melendez-Diaz,
 
 557 U.S. at -, 129 S.Ct. at 2541 (observing that notice-and-de
 
 *1100
 
 mand statutes “permit the defendant to assert (or forfeit by silence) his Confrontation Clause right after receiving notice of the prosecution’s intent to use a forensic analyst’s report”).
 

 Bullcoming,
 
 564 U.S. at -, 131 S.Ct. at 2718.
 

 In the case before us, the record indicates that the defense received a copy of Ms. Wesley’s report in 2005. We neither find any indication in the appellate record that the defense objected to Dr. Montgomery’s testimony, nor an indication that the defense sought to subpoena Ms. Wesley. That being so, we do not find that this issue was preserved for appeal. Moreover, Louisiana provides a notice-and-procedure statute (La. R.S. 15:499,
 
 et seq.);
 
 both
 
 Melendez-Diaz
 
 and
 
 Bullcoming
 
 recognize and sanction such state statutes; and the Louisiana Supreme Court has declared Louisiana’s notice-and-demand statute, albeit pre-2010, which underwent minor changes in 2010, acceptable. We do not find that the trial court violated the defendant’s confrontation rights.
 

 Nevertheless, the report in this case is clearly testimonial, as was the report at issue in
 
 Melendez-Diaz.
 
 Assuming,
 
 arguendo,
 
 that the report in this case violated the Sixth Amendment, it would still be subject to a harmless error analysis.
 
 See Delaware v. Van Arsdall,
 
 475 U.S. 673, 106 S.Ct. 1431;
 
 State v. Broadway,
 
 96-2659 (La.10/19/99), 753 So.2d 801. The verdict may stand if the reviewing court 11fl9determines that the guilty verdict rendered in the particular trial is surely unattributable to the error.
 
 Broadway,
 
 p. 24, 753 So.2d at 817;
 
 see also Sullivan v. Louisiana,
 
 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).
 

 The jury in this case heard a uniform and consistent account of what happened at 1011 Fourth Street on 9 September 2002. Given the strong circumstantial evidence of the defendants’ guilt, the evidence that blood on the white T-shirt was the victim’s blood was merely one more factor for the jury to consider. All the evidence in this case points to the defendants as the individuals who stabbed Mr. Lorino to death.
 

 We find this assignment of error is mer-itless.
 

 CONCLUSION:
 

 For the foregoing reasons, the convictions and sentences of both Terry McEl-veen and Thatcher McElveen are affirmed.
 

 AFFIRMED.
 

 [1]
 

 . Terry and Thatcher McElveen were tried and convicted jointly of second-degree murder, and both are parties to this appeal. Each defendant is represented by different counsel on appeal, and each has filed a separate brief in this court.
 

 [2]
 

 . This court denied writs on the Motions to Suppress.
 
 See State v. McElveen,
 
 05-0953, unpub. (La.App. 4 Cir. 11/29/05) and
 
 State v. McElveen,
 
 05-0954, unpub. (La.App. 4 Cir. 12/1/05).
 

 [3]
 

 .Subsequent to 13 March 2005, the state withdrew its intent to seek the death penalty, and the defendants agreed to a joint trial for second-degree murder.
 

 [4]
 

 . The white T-shirt is alternately referred to as ‘‘white, red, and blue T-shirt,” and "Ralph Lauren T-shirt.”
 

 [5]
 

 . Following Ms. McElveen's testimony and out of the presence of the jury, the defense moved for a mistrial based upon Ms. McEl-veen’s mention of a plea bargain. The court denied the motion.
 

 [6]
 

 . The recording of the call was played in court as jurors read a transcribed copy of the call.
 

 [7]
 

 . The maximum suspension he could have received was 120 days.
 

 [8]
 

 . The "law of the case” doctrine applies to all prior rulings or decisions of an appellate court or the Supreme Court in the same case, not merely those arising from the full appeal process.
 
 See Pumphrey v. City of New Orleans,
 
 05-0979 (La.4/4/06), 925 So.2d 1202. This policy applies to parties who were parties to the case when the former decision was rendered and who thus had their day in court. The reasons for the "law of the case” doctrine is to avoid re-litigation of the same issue; to promote consistency of result in the same litigation; and to promote efficiency and fairness to both parties by affording a single opportunity for the argument and decision of the matter at issue.
 
 Day v. Campbell-Grosjean Roofing and Sheet Metal Corp.,
 
 260 La. 325, 330-33, 256 So.2d 105, 107-08 (1971). This doctrine is not an inflexible law; thus appellate courts are not absolutely bound thereby and may exercise discretion in its application of the doctrine. It should not be applied where it would accomplish an obvious injustice or where the former appellate decision was manifestly erroneous.
 

 [9]
 

 . The record is silent as to the race of each specific juror challenged. The court proceeds on the presumption that the challenged jurors were African-Americans.
 

 [10]
 

 . According to the state, the defendant’s breakdown of the racial composition of the jury venire in this case is based on the recorded observations of one of the defense counsel during trial, which were filed under seal in the district court without being reviewed by opposing counsel. The figures are not the result of questioning or of self-reporting by any member of the venire, and the Orleans Parish Criminal Jury Commissioner does not maintain records relating to the race of the members of the jury pool in any given month.
 

 [11]
 

 . The prosecution acknowledged that it did not fully recollect Ms. Johnson’s behavior and were relying primarily on their own notes made during voir dire, because the defense did not make its
 
 Batson
 
 objection until approximately twenty-four hours after voir dire and selection from the first panel had concluded.
 

 [12]
 

 . While one of the state’s proffered reasons for striking Ms. Johnson related to her body language, Terry does not present any argument as to how her body language was used as an impermissible pretext for striking her.
 

 [13]
 

 . We note that the trial court did not at any time find that the defendant had a
 
 prima facie
 
 case of discriminatory use of peremptory challenges by the state in relation to Ms. Bickham. Prior to the parties’ offering their respective back strikes, defense counsel attempted to note for the record his continuing objection to any potential back strikes prosecutors may exercise against African-Americans. The trial court never acknowledged that objection, let alone ruled on whether it would continue to find a
 
 prima facie
 
 pattern of discriminatory strikes given its satisfaction with the state’s race-neutral reasons for its strikes to that point. When counsel for the state used a back strike to excuse Ms. Bick-ham, it was defense counsel, not the court, who demanded his reasons for doing so. Counsel for the state offered his reasons upon defense counsel’s insistence.
 

 [14]
 

 . An important distinction between
 
 Collier
 
 and the instant case exists in the very reason offered by the state in each case in response to the trial court's finding of a
 
 prima facie
 
 pattern of discrimination. As opposed to the detailed, record-supported reasons proffered by the prosecution in the instant case — based upon which the court had ample evidence on which to make an informed determination under
 
 Batson’s
 
 third step — the state in
 
 Collier
 
 presented vague and conclusory reasons sufficient at best to rebut an initial
 
 prima facie
 
 finding.
 
 See Collier
 
 at 820-21 (noting prosecutor’s exercise of strikes on jurors because,
 
 inter alia,
 
 they were "smart ass[es];” "appeared to have a jaded attitude toward police;” “had a blank stare;” and were thought to be "too tolerant of crime.”).
 

 [15]
 

 . The record reflects that it was in fact defense counsel — not the court — who demanded race-neutral reasons from the state in relation to Ms. Bickham’s being struck, which the
 
 *1074
 
 state offered as a courtesy for the record. The record does not reflect that the trial court even found a
 
 prima facie
 
 pattern in relation to Ms. Bickham, let alone required the state to justify its decision to strike her.
 

 [16]
 

 . The state avers that the numbers provided as to the racial breakdown of the venire and final jury are the unscientific observations of defense counsel.
 

 [17]
 

 . While the trial court did not state that it did not find a
 
 prima facie
 
 pattern in as many words, defense counsel noted his objection and seemed to accept that no finding had been made. In any event, the trial court did not require the state to proffer race-neutral reasons; thus, one can (and we do) reasonably infer that no such finding was made.
 

 [18]
 

 . The record in
 
 Collier
 
 did not reflect whether the two jurors who voted not guilty were the African-Americans.
 

 [19]
 

 . In
 
 Batson,
 
 the trial jury was entirely Caucasian and was drawn from a venire containing only four African-Americans. 476 U.S. at 83, 106 S.Ct. 1712. In
 
 Snyder, supra,
 
 the African-American defendant was found guilty and sentenced to death by an all-Caucasian jury drawn from a panel containing only five African-Americans, all of whom were struck by the state. 552 U.S. at 475, 128 S.Ct. 1203. In
 
 State v. Duncan,
 
 99-2615 (La. 10/16/01), 802 So.2d 533, the Court found that the Caucasian defendant had failed to establish a
 
 prima facie
 
 case of discriminatory strikes against African-American venire persons despite his conviction at the hands of a jury that contained eleven Caucasians and one African-American.
 
 Id.,
 
 p. 11, 802 So.2d at 543.
 

 In finding Duncan’s claim to be without merit, the Court acknowledged that "the mere presence of some African-Americans on the jury is no bar to finding a
 
 prima facie
 
 case,” but admonished nonetheless “that it is appropriate to consider the fact that the State did not eliminate all African-Americans when deciding whether or not there exists a
 
 prima facie
 
 case of discrimination.”
 
 Id.,
 
 p. 21, 802 So.2d at 549. The trial court’s refusal to find a
 
 prima facie
 
 pattern was upheld despite the fact that the state had exercised its peremptory challenges to strike 84% of the African-American and only 12% of the Caucasian venire persons.
 
 See Id.,
 
 p. 22, 802 So.2d at 548-49.
 

 [20]
 

 .The defendant in
 
 Thompson
 
 was convicted prior to the
 
 Batson
 
 decision, but his case was pending on appeal when
 
 Batson
 
 was issued. Thus, the Supreme Court analyzed his claim under
 
 Batson.
 

 [21]
 

 . La. C.E. art. 410 states in pertinent part:
 

 A. General rale. Except as otherwise provided in this Article, evidence of the following is not, in any civil or criminal proceeding, admissible against the party who made the plea or was a participant in the plea discussions:
 

 (1) A plea of guilty or of nolo contendere which was later withdrawn or set aside;
 

 (2) In a civil case, a plea of nolo conten-dere; (3) Any statement made in the course of any court proceeding concerning either of the foregoing pleas, or any plea discussions with an attorney for or other representative of the prosecuting authority regarding either of the foregoing pleas; or
 

 (4) Any statement made in the course of plea discussions with an attorney for or other representative of the prosecuting authority which do not result in a plea of guilty or which result in a plea of guilty later withdrawn or set aside.
 

 [22]
 

 . La. C.E. art. 612 provides in pertinent part:
 

 B. Criminal cases. In a criminal case, any writing, recording, or object may be used by a witness to refresh his memory while testifying. If a witness asserts that his memory is refreshed he must then testify from memory independent of the writing, recording, or object. If while testifying a witness uses a writing, recording, or object to refresh his memory an adverse party is entitled, subject to Paragraph C, to inspect it, to examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness.
 

 Note (a) of Comments under C.E. art. 612 reads:
 

 This Article follows former R.S. 15:279 in permitting a witness to refresh his memory by examining a writing, recording or object
 
 regardless of when and by whom it was prepared.
 
 This Article is based on Federal Rule of Evidence 612. [Emphasis supplied.]
 

 [23]
 

 . La. R.S. 15:450 provides:
 

 Every confession, admission or declaration sought to be used against any one must be used in its entirety, so that the person to be affected thereby may have the benefit of any exculpation or explanation that the whole statement may afford.
 

 [24]
 

 . La.C.Cr.P. art. 905.2 provides in pertinent part:
 

 A. The sentencing hearing shall focus on the circumstances of the offense, the character and propensities of the offender, and the victim, and the impact that the crime has had on the victim, family members, friends, and associates. The victim or his family members, friends, and associates may decline the right to testify but, after testifying for the state, shall be subject to cross examination. The hearing shall be conducted according to the rules of evidence. Evidence relative to aggravating or mitigating circumstances shall be relevant irrespective of whether the defendant places his character at issue. Insofar as applicable, the procedure shall be the same as that provided for trial in the Code of Criminal Procedure. The jury may consider any evidence offered at the trial on the issue of guilt. The defendant may testify in his own behalf. In the event of retrial, the defendant’s testimony shall not be admissible except for the purposes of impeachment.
 

 [25]
 

 . La. R.S. 14:30.1 provides in pertinent part: A. Second degree murder is the killing of a human being:
 

 (1) When the offender has a specific intent to kill or to inflict great bodily harm; or
 

 (2) When the offender is engaged in the perpetration or attempted perpetration of.... [Emphasis supplied.]
 

 [26]
 

 . The record on appeal did not contain a transcript of the proceedings on 13 March 2009. By order of this court issued on 26 August 2011, but only to fully address Terry’s assigned error number 11 due to the absence of the precise number of juror votes for guilt, we ordered that a transcript of the final day's proceedings be transcribed and furnished to this court by 16 September 2011. La.C.Cr.P. art. 914.1 states in pertinent part:
 

 A. The party making the motion for appeal shall, at the time the motion is made, request the transcript of that portion of the proceedings necessary, in light of the assignment of errors to be urged. Not later than five days after the motion, the
 
 *1091
 
 opposing party may designate in writing the transcript of that portion or portions of the proceedings necessary to oppose the appeal.
 

 [[Image here]]
 

 D. The trial court or the appellate court may designate additional portions of the transcript of the proceedings which it feels are necessary for full and fair review of the assignment of errors.
 

 On 19 September 2011, this court learned from an inquiry that the court reporter who recorded the 13 March 2009 proceedings: (a) has been out of work and disabled since July 2011 due to an arm injury; (b) is scheduled to be operated on during the week of September 19; (c) that she first learned about the need for the transcript on 15 September 2011; arid (d) is not to return to work any earlier than 14 November 2011.
 

 The minutes of the trial court for 13 March 2009 reads verbatim (save the original is written in capital letters) in pertinent part as follows:
 

 The defendant, Thatcher McElveen, appeared before the Court for trial represented by Julie Kilborne and David Price the defendant, Terry McElveen, appeared before the Court for trial represented by Rick Tessier and Ben Cohen
 

 The Court advised the defendant of his right to trial by judge or jury. The defendant elected to have trial by jury.
 

 Payel Patel and David Pipes represented the state.
 

 The State amended Count 1 of the Bill of Information to read RS 14:30.1 second degree murder.
 

 The State amended Count 1 of the Bill of Information to read RS 14:30.1 second degree murder.
 

 Closing argument for the State began at 10:15 am.
 

 David Pipes gave the closing argument for the State.
 

 David Price began closing arguments for the defense.
 

 Closing argument for the State ended at 10:29 am.
 

 Closing argument for the defense began at 10:29 am.
 

 After a brief recess by the defense closing arguments continued with Rick Tessier at 11:33 am and ended at 12:55 pm.
 

 Closing argument for the defense ended at 11:33 am.
 

 Rebuttal argument for the State began at 2:16 pm.
 

 Payel Patel gave the rebuttal argument for the State.
 

 Rebuttal argument for the State ended at 2:47 pm.
 

 The Court charged the jury as to the law in this matter.
 

 The jury retired at 3:00 pm to deliberate.
 

 As to defendant Thatcher McElveen, guilty as charged.
 

 As to defendant Teriy McElveen, guilty as charged.
 

 The jury returned at 5:26 pm with the following verdict:
 

 For defendant Thatcher McElveen
 

 As to Count 1, RS 14:30.1 Second Degree Murder, the defendant was found guilty by the jury.
 

 For defendant Terry McElveen
 

 As to Count 1, RS 14:30.1 Second Degree Murder, the defendant was found guilty by the jury.
 

 Sentencing in this matter is set for 04/20/09.
 

 Place the defendant on the jail list.
 

 The assigned error on appeal arising on the final day of the trial relates to the failure of the jury to return a unanimous verdict. Although the record before us does not reflect the jury’s precise final vote, the minute entry affirmatively shows that the defendants were both found guilty of second-degree murder.
 

 Terry argues on appeal that the verdict was 11 to 1 for guilt. The state does not dispute that verdict. We assume that the jury’s vote for guilt was 11 to 1 or, in a “worst case” scenario, 10-2, both of which votes would be enough to find each of the defendants guilty as charged.
 

 Accordingly, we now find it appropriate to discuss the assignment of error and decide this case without the 13 March 2009 transcript because no party to these proceedings asserts that a less than
 
 statutorily
 
 required number of jurors returned a guilty verdict. La.C.Cr.P. art. 782.
 

 [27]
 

 .
 
 State v. Prieur,
 
 277 So.2d 126 (La.1973).
 

 [28]
 

 . La.C.Cr.P. art. 843 states:
 

 In felony cases, in cases involving violation of an ordinance enacted pursuant to R.S. 14:143(B), and on motion of the court, the state, or the defendant in other misdemeanor cases tried in a district, parish, or city court, the clerk or court stenographer shall record all of the proceedings, includ
 
 *1096
 
 ing the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel.
 

 [29]
 

 . Dr. Montgomery was the DNA Technical Leader of the NOPD Crime Lab from 2001 to 2007. Dr. Montgomery testified at trial that she trained Ms. Wesley to perform DNA testing. Moreover, Dr. Montgomery told the court that she reviewed Ms. Wesley’s testing procedures and results for accuracy and that after satisfying herself of the reliability of Ms. Wesley’s procedures and findings, signed her name to Ms. Wesley’s report.
 

 [30]
 

 . La. R.S. 15:499 and La. R.S. 15:501 were amended by Acts 2010, No. 693, § 1 (effective 15 August 2010). As to section 499, the legislature merely eliminated the requirement in subparagraph B that the certificate of analysis be signed by the person in charge of the facility. In regard to section 501, the legislature amended the law to require the party
 
 *1097
 
 seeking to introduce a certificate to give written notice of that intent no less than forty-five days prior to the commencement of trial. Furthermore, the statute no longer requires the party against whom it is offered to subpoena the person who performed the examination in order to prevent the report from being deemed
 
 prima facie
 
 proof of its contents. Section 501 now only requires that the defendant demand — in writing and serve upon the district attorney or attorney general seeking to introduce the certificate — that the person making the examination or analysis testify. If such a demand is made timely as set forth below, the certificate shall not constitute
 
 prima facie
 
 proof of the facts therein as set forth in La. R.S. 15:500. Such written demand must be made within thirty days of the receipt of the notice by the district attorney of its intent to use the certificate, subject to extension for good cause shown if such request is made prior to the expiration of the 30 days. (References herein are to the versions of the statutes prior to their 2010 amendments.)
 

 [31]
 

 . In
 
 Simmons,
 
 just prior to the beginning of trial, counsel made a
 
 motion in limine
 
 raising the issue, citing
 
 Melendez-Diaz.
 
 The state urged that the motion had to be made ten days before trial. The court asked whether the criminalist could testify and learned that the criminalist was Harry O’Neal from St. Tammany Parish, who was not immediately available. It subsequently denied the
 
 motion in limine
 
 as untimely. Defense counsel noted his objection. In
 
 Simmons,
 
 the state’s notice of intent to introduce into evidence the state’s criminalist report as
 
 prima facie
 
 proof was timely filed on 24 February 2010 under La. R.S. 14:499-501 as it read at the time of Simmons’ trial. The defense did not request that a subpoena be issued within five days prior to trial and only noted its objection on the day of trial, 18 May 2010. After the objection was denied, the matter proceeded to trial.
 
 Simmons
 
 is distinguishable from the present case because here defense counsel did not object prior to trial.
 

 [32]
 

 . In
 
 State v. Beauchamp,
 
 10-0451 (La.App. 1 Cir. 9/10/10), 49 So.3d 5, the court distinguished the Massachusetts law permitting the use of "certificates of analysis” as proof, which was struck down in
 
 Melendez-Diaz,
 
 from Louisiana's notice-and-demand statutory scheme for use of an analyst’s report as evidence. The court noted that
 
 Melendez-Diaz
 
 itself recognized that other states’ "notice- and-demand statutes” did not shift the burden by converting the prosecution's duty under the Confrontation Clause into the defendant’s privilege under state law or the Compulsory Process Clause. Because ”[t]he defendant always has the burden of raising his Confrontation Clause objection,” the court reasoned "notice-and-demand statutes simply govern the time within which he must do so.”
 
 Beauchamp,
 
 p. 4, 49 So.3d at 8, citing
 
 Melendez-Diaz,
 
 557 U.S. at -, 129 S.Ct. at 2541.
 

 In addressing the "notice-and-demand” scheme set forth in La.R.S. 15:499,
 
 et seq.,
 
 the
 
 Beauchamp
 
 court concluded that the admission of a scientific analysis report in accordance therewith "did not violate
 
 Melendez-Diaz
 
 ...” as the scheme "merely requires a defendant to exercise his Confrontation Clause rights prior to trial.”
 
 Beauchamp,
 
 p. 8, 49 So.3d at 9-10.
 

 The
 
 Beauchamp
 
 court also noted that in a
 
 pre-Melendez-Diaz
 
 opinion, the Louisiana Supreme Court had concluded that Louisiana’s "notice-and-demand” statutes were constitutional under
 
 Crawford v. Washington,
 
 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).
 
 See State v. Cunningham,
 
 04-2200 (La.6/13/05), 903 So.2d 1110. In rejecting the challenge to the scheme’s constitutionality, the Louisiana Supreme Court noted that to defeat the use of the certificate without the analyst, the defendant need only request a subpoena of the individual five days prior to trial. The Court held this requirement did not "infringe upon defendant’s constitutional right to confrontation.”
 
 Id.,
 
 p. 17, 903 So.2d at 1121.